FULLILOVE ET AL. *v.* KLUTZNICK, SECRETARY OF
COMMERCE, ET AL.

No. 78–1007.   Argued November 27, 1979—Decided July 2, 1980

450

BURGER, C. J., announced the judgment of the Court and delivered an opinion, in which WHITE and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 495. MARSHALL, J., filed an opinion concurring in the judgment, in which BRENNAN and BLACKMUN, JJ., joined, *post*, p. 517. STEWART, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 522. STEVENS, J., filed a dissenting opinion, *post*, p. 532.

*Robert G. Benisch* argued the cause for petitioners Fullilove et al. With him on the briefs was *Robert J. Fink. Robert J. Hickey* argued the cause for petitioner General Building Contractors of New York State, Inc., the New York State Building Chapter, Associated General Contractors of America, Inc. With him on the briefs was *Peter G. Kilgore.*

*Assistant Attorney General Days* argued the cause for respondents. With him on the brief for respondent Secretary of Commerce were *Solicitor General McCree, Deputy Solicitor General Wallace, Brian K. Landsberg, Jessica Dunsay Silver,* and *Vincent F. O'Rourke, Jr. Robert Abrams,* Attorney General of New York, *Shirley Adelson Siegel,* Solicitor General, and *Arnold D. Fleischer* and *Barbara E. Levy,* Assistant Attorneys General, filed a brief for respondent State of New York. *Allen G. Schwartz, James G. Greilsheimer, L. Kevin Sheridan,* and *Frances M. Morris* filed a brief for respondents City of New York et al.*

---

*Briefs of *amici curiae* urging reversal were filed by *Kenneth C. McGuiness, Douglas S. McDowell,* and *Daniel R. Levinson* for the Equal Employment Advisory Council; and by *Ronald A. Zumbrun* and *John H. Findley* for the Pacific Legal Foundation.

Briefs of *amici curiae* urging affirmance were filed by *Julian B. Wilkins* and *Jewel S. Lafontant* for Alpha Kappa Alpha Sorority, Inc.; by *E. Richard Larson, Burt Neuborne, Frank Askin,* and *Robert Sedler* for the American Civil Liberties Union et al.; by *Ronald J. Greene* for the American Savings & Loan League, Inc., et al.; by *Bill Lann Lee* for the Asian American Legal Defense and Education Fund, Inc.; by *John B. Jones, Jr., Norman Redlich, William L. Robinson, Richard T. Seymour, Norman J. Chachkin, Laurence S. Fordham, Henry P. Monaghan,* and

MR. CHIEF JUSTICE BURGER announced the judgment of the Court and delivered an opinion, in which MR. JUSTICE WHITE and MR. JUSTICE POWELL joined.

We granted certiorari to consider a facial constitutional challenge to a requirement in a congressional spending program that, absent an administrative waiver, 10% of the federal funds granted for local public works projects must be used by the state or local grantee to procure services or supplies from businesses owned and controlled by members of statutorily identified minority groups. 441 U. S. 960 (1979).

I

In May 1977, Congress enacted the Public Works Employment Act of 1977, Pub. L. 95–28, 91 Stat. 116, which amended the Local Public Works Capital Development and Investment Act of 1976, Pub. L. 94–369, 90 Stat. 999, 42 U. S. C. § 6701 *et seq.* The 1977 amendments authorized an additional $4 billion appropriation for federal grants to be made by the Secretary of Commerce, acting through the Economic Development Administration (EDA), to state and local governmental entities for use in local public works projects. Among the changes made was the addition of the provision that has

*Robert D. Goldstein* for the Lawyers' Committee for Civil Rights Under Law; by *Vilma S. Martinez, Morris J. Baller,* and *Joel G. Contreras* for the Mexican American/Hispanic Contractors and Truckers Association, Inc., et al.; by *Daniel T. Ingram, Jr.,* for the Minority Contractors Assistance Project, Inc.; by *Nathaniel R. Jones, J. Francis Pohlhaus,* and *John A. Fillion* for the National Association for the Advancement of Colored People et al.; by *Jack Greenberg, James M. Nabrit III, Eric Schnapper, Vernon E. Jordan, Jr.,* and *Robert L. Harris* for the NAACP Legal Defense and Educational Fund, Inc., et al.; and by *Robert T. Pickett* for the National Bar Association, Inc., et al.

Briefs of *amici curiae* were filed by *Arthur Kinoy* for the Affirmative Action Coordinating Center et al.; by *Robert A. Helman, Justin J. Finger, Jeffrey P. Sinensky,* and *Richard A. Weisz* for the Anti-Defamation League of B'nai B'rith; by *Walter R. Echo-Hawk* and *Robert S. Pelcyger* for the Minority Contractors Association, Inc.; and by *Bernard Parks* and *Lenwood A. Jackson* for the National Conference of Black Mayors, Inc.

become the focus of this litigation. Section 103 (f)(2) of the 1977 Act, referred to as the "minority business enterprise" or "MBE" provision, requires that: [1]

> "Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term 'minority business enterprise' means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts."

In late May 1977, the Secretary promulgated regulations governing administration of the grant program which were amended two months later.[2] In August 1977, the EDA issued guidelines supplementing the statute and regulations with respect to minority business participation in local public works grants,[3] and in October 1977, the EDA issued a technical bulletin promulgating detailed instructions and information to assist grantees and their contractors in meeting the 10% MBE requirement.[4]

---

[1] 91 Stat. 116, 42 U. S. C. § 6705 (f)(2) (1976 ed., Supp. II).

[2] 42 Fed. Reg. 27432 (1977), as amended by 42 Fed. Reg. 35822 (1977); 13 CFR Part 317 (1978).

[3] U. S. Dept. of Commerce, Economic Development Administration, Local Public Works Program, Round II, Guidelines For 10% Minority Business Participation In LPW Grants (1977) (hereinafter Guidelines); App. 156a–167a.

[4] U. S. Dept. of Commerce, Economic Development Administration, EDA Minority Business Enterprise (MBE) Technical Bulletin (Additional

On November 30, 1977, petitioners filed a complaint in the United States District Court for the Southern District of New York seeking declaratory and injunctive relief to enjoin enforcement of the MBE provision. Named as defendants were the Secretary of Commerce, as the program administrator, and the State and City of New York, as actual and potential project grantees. Petitioners are several associations of construction contractors and subcontractors, and a firm engaged in heating, ventilation, and air conditioning work. Their complaint alleged that they had sustained economic injury due to enforcement of the 10% MBE requirement and that the MBE provision on its face violated the Equal Protection Clause of the Fourteenth Amendment, the equal protection component of the Due Process Clause of the Fifth Amendment, and various statutory antidiscrimination provisions.[5]

After a hearing held the day the complaint was filed, the District Court denied a requested temporary restraining order and scheduled the matter for an expedited hearing on the merits. On December 19, 1977, the District Court issued a memorandum opinion upholding the validity of the MBE program and denying the injunctive relief sought. *Fullilove* v. *Kreps*, 443 F. Supp. 253 (1977).

The United States Court of Appeals for the Second Circuit affirmed, 584 F. 2d 600 (1978), holding that "even under the most exacting standard of review the MBE provision passes constitutional muster." *Id.*, at 603. Considered in the context of many years of governmental efforts to remedy past racial and ethnic discrimination, the court found it

---

Assistance and Information Available to Grantees and Their Contractors In Meeting The 10% MBE Requirement) (1977) (hereinafter Technical Bulletin); App. 129a–155a.

[5] 42 U. S. C. §§ 1981, 1983, 1985; Title VI, § 601 of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. § 2000d; Title VII, § 701 *et seq.* of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.*

"difficult to imagine" any purpose for the program other than to remedy such discrimination. *Id.,* at 605. In its view, a number of factors contributed to the legitimacy of the MBE provision, most significant of which was the narrowed focus and limited extent of the statutory and administrative program, in size, impact, and duration, *id.,* at 607–608; the court looked also to the holdings of other Courts of Appeals and District Courts that the MBE program was constitutional, *id.,* at 608–609.[6] It expressly rejected petitioners' contention that the 10% MBE requirement violated the equal protection guarantees of the Constitution.[7] *Id.,* at 609.

## II

### A

The MBE provision was enacted as part of the Public Works Employment Act of 1977, which made various amendments to Title I of the Local Public Works Capital Development and Investment Act of 1976. The 1976 Act was in-

---

[6] *Ohio Contractors Assn.* v. *Economic Development Administration,* 580 F. 2d 213 (CA6 1978); *Constructors Assn.* v. *Kreps,* 573 F. 2d 811 (CA3 1978); *Rhode Island Chapter, Associated General Contractors* v. *Kreps,* 450 F. Supp. 338 (RI 1978); *Associated General Contractors* v. *Secretary of Commerce,* No. 77–4218 (Kan. Feb. 9, 1978); *Carolinas Branch, Associated General Contractors* v. *Kreps,* 442 F. Supp. 392 (SC 1977); *Ohio Contractors Assn.* v. *Economic Development Administration,* 452 F. Supp. 1013 (SD Ohio 1977); *Montana Contractors' Assn.* v. *Secretary of Commerce,* 439 F. Supp. 1331 (Mont. 1977); *Florida East Coast Chapter* v. *Secretary of Commerce,* No. 77–8351 (SD Fla. Nov. 3, 1977); but see *Associated General Contractors* v. *Secretary of Commerce,* 441 F. Supp. 955 (CD Cal. 1977), vacated and remanded for consideration of mootness, 438 U. S. 909 (1978), on remand, 459 F. Supp. 766 (CD Cal.), vacated and remanded *sub nom. Armistead* v. *Associated General Contractors of California, post,* p. 908.

[7] Both the Court of Appeals and the District Court rejected petitioners' various statutory arguments without extended discussion. 584 F. 2d, at 608, n. 15; 443 F. Supp., at 262.

tended as a short-term measure to alleviate the problem of national unemployment and to stimulate the national economy by assisting state and local governments to build needed public facilities.[8] To accomplish these objectives, the Congress authorized the Secretary of Commerce, acting through the EDA, to make grants to state and local governments for construction, renovation, repair, or other improvement of local public works projects.[9] The 1976 Act placed a number of restrictions on project eligibility designed to assure that federal moneys were targeted to accomplish the legislative purposes.[10] It established criteria to determine grant priorities and to apportion federal funds among political jurisdictions.[11] Those criteria directed grant funds toward areas of high unemployment.[12] The statute authorized the appropriation of up to $2 billion for a period ending in September 1977;[13] this appropriation was soon consumed by grants made under the program.

Early in 1977, Congress began consideration of expanded appropriations and amendments to the grant program. Under administration of the 1976 appropriation, referred to as "Round I" of the local public works program, applicants seeking some $25 billion in grants had competed for the $2 billion in available funds; of nearly 25,000 applications, only some 2,000 were granted.[14] The results provoked widespread

---

[8] H. R. Rep. No. 94–1077, p. 2 (1976). The bill discussed in this Report was accepted by the Conference Committee in preference to the Senate version. S. Conf. Rep. No. 94–939, p. 1 (1976); H. R. Conf. Rep. No. 94–1260, p. 1 (1976).

[9] 90 Stat. 999, 42 U. S. C. § 6702.

[10] 90 Stat. 1000, 42 U. S. C. § 6705.

[11] 90 Stat. 1000, 42 U. S. C. § 6707.

[12] 90 Stat. 1001, 42 U. S. C. § 6707 (c).

[13] 90 Stat. 1002, 42 U. S. C. § 6710. The actual appropriation of the full amount authorized was made several weeks later. Pub. L. 94–447, 90 Stat. 1497.

[14] 123 Cong. Rec. 2136 (1977) (remarks of Sen. Randolph).

concern for the fairness of the allocation process.[15]   Because
the 1977 Act would authorize the appropriation of an addi-
tional $4 billion to fund "Round II" of the grant program,[16]
the congressional hearings and debates concerning the amend-
ments focused primarily on the politically sensitive problems
of priority and geographic distribution of grants under the
supplemental appropriation.[17]   The result of this attention
was inclusion in the 1977 Act of provisions revising the alloca-
tion criteria of the 1976 legislation.   Those provisions, how-
ever, retained the underlying objective to direct funds into
areas of high unemployment.[18]   The 1977 Act also added new
restrictions on applicants seeking to qualify for federal
grants; [19] among these was the MBE provision.

The origin of the provision was an amendment to the House
version of the 1977 Act, H. R. 11, offered on the floor of the
House on February 23, 1977, by Representative Mitchell of
Maryland.[20]   As offered, the amendment provided: [21]

> "Notwithstanding any other provision of law, no grant
> shall be made under this Act for any local public works
> project unless at least 10 per centum of the articles,
> materials, and supplies which will be used in such project
> are procured from minority business enterprises.  For
> purposes of this paragraph, the term 'minority business

[15] See, e. g., Hearings on H. R. 11 and Related Bills before the Subcom-
mittee on Economic Development of the House Committee on Public
Works and Transportation, 95th Cong., 1st Sess. (1977); H. R. Rep.
No. 95–20 (1977); S. Rep. No. 95–38 (1977).

[16] 91 Stat. 119, 42 U. S. C. § 6710 (1976 ed., Supp. II).  The actual
appropriation of the full authorized amount was made the same day.
Pub. L. 95–29, 91 Stat. 123.

[17] E. g., Hearings, supra n. 15; 123 Cong. Rec. 5290–5353 (1977); id.,
at 7097–7176.

[18] 91 Stat. 117, 42 U. S. C. § 6707 (1976 ed., Supp. II).

[19] 91 Stat. 116, 42 U. S. C. § 6705 (1976 ed., Supp. II).

[20] 123 Cong. Rec. 5097 (1977) (remarks of Rep. Mitchell).

[21] Id., at 5098.

enterprise' means a business at least 50 percent of which is owned by minority group members or, in case of publicly owned businesses, at least 51 percent of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts."

The sponsor stated that the objective of the amendment was to direct funds into the minority business community, a sector of the economy sorely in need of economic stimulus but which, on the basis of past experience with Government procurement programs, could not be expected to benefit significantly from the public works program as then formulated.[22] He cited the marked statistical disparity that in fiscal year 1976 less than 1% of all federal procurement was concluded with minority business enterprises, although minorities comprised 15–18% of the population.[23] When the amendment was put forward during debate on H. R. 11,[24] Representative Mitchell reiterated the need to ensure that minority firms would obtain a fair opportunity to share in the benefits of this Government program.[25]

The amendment was put forward not as a new concept, but rather one building upon prior administrative practice.

[22] *Id.*, at 5097–5098.

[23] *Id.*, at 5098.

[24] *Id.*, at 5327. As reintroduced, the first sentence of the amendment was modified to provide:

"Notwithstanding any other provision of law, no grant shall be made under this Act for any local public works project unless at least 10 per centum of the dollar volume of each contract shall be set aside for minority business enterprise and, or, unless at least 10 per centum of the articles, materials, and supplies which will be used in such project are procured from minority business enterprises."

[25] *Id.*, at 5327–5328.

In his introductory remarks, the sponsor rested his proposal squarely on the ongoing program under § 8 (a) of the Small Business Act, Pub. L. 85–536, § 2, 72 Stat. 389, which, as will become evident, served as a model for the administrative program developed to enforce the MBE provision: [26]

> "The first point in opposition will be that you cannot have a set-aside. Well, Madam Chairman, we have been doing this for the last 10 years in Government. The 8–A set-aside under SBA has been tested in the courts more than 30 times and has been found to be legitimate and bona fide. We are doing it in this bill."

Although the proposed MBE provision on its face appeared mandatory, requiring compliance with the 10% minority participation requirement "[n]otwithstanding any other provision of law," its sponsor gave assurances that existing administrative practice would ensure flexibility in administration if, with respect to a particular project, compliance with the 10% requirement proved infeasible.[27]

Representative Roe of New Jersey then suggested a change of language expressing the twin intentions (1) that the federal administrator would have discretion to waive the 10% requirement where its application was not feasible, and (2) that the grantee would be mandated to achieve at least 10% participation by minority businesses unless infeasibility was demonstrated.[28] He proposed as a substitute for the first sentence of the amendment the language that eventually was enacted: [29]

> "Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per-

---

[26] *Id.*, at 5327.

[27] *Id.*, at 5327–5328.

[28] *Id.*, at 5328 (remarks of Rep. Roe).

[29] *Ibid.*

cent of the amount of each grant shall be expended for minority business enterprises."

The sponsor fully accepted the suggested clarification because it retained the directive that the initial burden of compliance would fall on the grantee. That allocation of burden was necessary because, as he put it, "every agency of the Government has tried to figure out a way to avoid doing this very thing. Believe me, these bureaucracies can come up with 10,000 ways to avoid doing it." [30]

Other supporters of the MBE amendment echoed the sponsor's concern that a number of factors, difficult to isolate or quantify, seemed to impair access by minority businesses to public contracting opportunities. Representative Conyers of Michigan spoke of the frustration of the existing situation, in which, due to the intricacies of the bidding process and through no fault of their own, minority contractors and businessmen were unable to gain access to government contracting opportunities.[31]

Representative Biaggi of New York then spoke to the need for the amendment to "promote a sense of economic equality in this Nation." He expressed the view that without the amendment, "this legislation may be potentially inequitable to minority businesses and workers" in that it would perpetuate the historic practices that have precluded minority businesses from effective participation in public contracting opportunities.[32] The amendment was accepted by the House.[33]

Two weeks later, the Senate considered S. 427, its package of amendments to the Local Public Works Capital Development and Investment Act of 1976. At that time Senator Brooke of Massachusetts introduced an MBE amendment,

---

[30] Id., at 5329 (remarks of Rep. Mitchell).
[31] Id., at 5330 (remarks of Rep. Conyers).
[32] Id., at 5331 (remarks of Rep. Biaggi).
[33] Id., at 5332.

worded somewhat differently than the House version, but aimed at achieving the same objectives.[34] His statement in support of the 10% requirement reiterated and summarized the various expressions on the House side that the amendment was necessary to ensure that minority businesses were not deprived of access to the government contracting opportunities generated by the public works program.[35]

The Senate adopted the amendment without debate.[36] The Conference Committee, called to resolve differences between the House and Senate versions of the Public Works Employment Act of 1977, adopted the language approved by the House for the MBE provision.[37] The Conference Reports added only the comment: "This provision shall be dependent on the availability of minority business enterprises located in the project area."[38]

The device of a 10% MBE participation requirement, subject to administrative waiver, was thought to be required to assure minority business participation; otherwise it was thought that repetition of the prior experience could be ex-

---

[34] Id., at 7155–7156 (remarks of Sen. Brooke). The first paragraph of Senator Brooke's formulation was identical to the version originally offered by Representative Mitchell, quoted in the text, supra, at 458–459. A second paragraph of Senator Brooke's amendment provided:

"This section shall not be interpreted to defund projects with less than 10 percent minority participation in areas with minority population of less than 5 percent. In that event, the correct level of minority participation will be predetermined by the Secretary in consultation with EDA and based upon its lists of qualified minority contractors and its solicitation of competitive bids from all minority firms on those lists." 123 Cong. Rec. 7156 (1977).

[35] Ibid.

[36] Ibid.

[37] S. Conf. Rep. No. 95–110, p. 11 (1977); H. R. Conf. Rep. No. 95–230, p. 11 (1977).

[38] Ibid. The Conference Committee bill was agreed to by the Senate, 123 Cong. Rec. 12941–12942 (1977), and by the House, id., at 13242–13257, and was signed into law on May 13, 1977.

pected, with participation by minority business accounting for an inordinately small percentage of government contracting. The causes of this disparity were perceived as involving the longstanding existence and maintenance of barriers impairing access by minority enterprises to public contracting opportunities, or sometimes as involving more direct discrimination, but not as relating to lack—as Senator Brooke put it—"of capable and qualified minority enterprises who are ready and willing to work." [39] In the words of its sponsor, the MBE provision was "designed to begin to redress this grievance that has been extant for so long." [40]

## B

The legislative objectives of the MBE provision must be considered against the background of ongoing efforts directed toward deliverance of the century-old promise of equality of economic opportunity. The sponsors of the MBE provision in the House and the Senate expressly linked the provision to the existing administrative programs promoting minority opportunity in government procurement, particularly those related to § 8 (a) of the Small Business Act of 1953.[41] Section 8 (a) delegates to the Small Business Administration (SBA) an authority and an obligation "whenever it determines such action is necessary" to enter into contracts with any procurement agency of the Federal Government to furnish required goods or services, and, in turn, to enter into subcontracts with small businesses for the performance of such contracts. This authority lay dormant for a decade. Commencing in 1968, however, the SBA was directed by the President [42] to develop a program pursuant to its § 8 (a) authority to assist small

---

[39] *Id.*, at 7156 (remarks of Sen. Brooke).

[40] *Id.*, at 5330 (remarks of Rep. Mitchell).

[41] *Id.*, at 5327; *id.*, at 7156 (remarks of Sen. Brooke).

[42] Exec. Order No. 11375, 3 CFR 684 (1966–1970 Comp.); Exec. Order No. 11518, 3 CFR 907 (1966–1970 Comp.).

business concerns owned and controlled by "socially or economically disadvantaged" persons to achieve a competitive position in the economy.

At the time the MBE provision was enacted, the regulations governing the § 8 (a) program defined "social or economic disadvantage" as follows: [43]

> "An applicant concern must be owned and controlled by one or more persons who have been deprived of the opportunity to develop and maintain a competitive position in the economy because of social or economic disadvantage. Such disadvantage may arise from cultural, social, chronic economic circumstances or background, or other similar cause. Such persons include, but are not limited to, black Americans, American Indians, Spanish-Americans, oriental Americans, Eskimos, and Aleuts...."

The guidelines accompanying these regulations provided that a minority business could not be maintained in the program, even when owned and controlled by members of the identified minority groups, if it appeared that the business had not been deprived of the opportunity to develop and maintain a competitive position in the economy because of social or economic disadvantage.[44]

---

[43] 13 CFR § 124.8–1 (c)(1) (1977).

[44] U. S. Small Business Administration, Office of Business Development, Section 8 (a) Program, Standard Operating Procedure 15–16 (1976); see H. R. Rep. No. 94–468, p. 30 (1975) ("[T]he relevant rules and regulations require such applicant to identify with the disadvantages of his or her racial group generally, and that such disadvantages must have personally affected the applicant's ability to enter into the mainstream of the business system"); U. S. Small Business Administration, Office of Minority Small Business and Capital Ownership Development, MSB & COD Programs, Standard Operating Procedure 20 (1979) ("The social disadvantage of individuals, including those within the above-named [racial and ethnic] groups, shall be determined by SBA on a case-by-case basis. Membership alone in any group is not conclusive that an individual is socially disadvantaged").

As the Congress began consideration of the Public Works Employment Act of 1977, the House Committee on Small Business issued a lengthy Report summarizing its activities, including its evaluation of the ongoing § 8 (a) program.[45] One chapter of the Report, entitled "Minority Enterprises and Allied Problems of Small Business," summarized a 1975 Committee Report of the same title dealing with this subject matter.[46] The original Report, prepared by the House Subcommittee on SBA Oversight and Minority Enterprise, observed: [47]

> "The subcommittee is acutely aware that the economic policies of this Nation must function within and be guided by our constitutional system which guarantees 'equal protection of the laws.' *The effects of past inequities stemming from racial prejudice have not remained in the past. The Congress has recognized the reality that past discriminatory practices have, to some degree, adversely affected our present economic system.*
>
> "While minority persons comprise about 16 percent of the Nation's population, of the 13 million businesses in the United States, only 382,000, or approximately 3.0 percent, are owned by minority individuals. The most recent data from the Department of Commerce also indicates that the gross receipts of all businesses in this country totals about $2,540.8 billion, and of this amount only $16.6 billion, or about 0.65 percent was realized by minority business concerns.
>
> "These statistics are not the result of random chance. The presumption must be made that past discriminatory systems have resulted in present economic inequities. In order to right this situation, the Congress has formulated certain remedial programs designed to uplift those socially

---

[45] H. R. Rep. No. 94–1791 (1977).

[46] *Id.*, at 124–149.

[47] H. R. Rep. No. 94–468, pp. 1–2 (1975) (emphasis added).

or economically disadvantaged persons to a level where they may effectively participate in the business mainstream of our economy.*

"*For the purposes of this report the term 'minority' shall include only such minority individuals as are considered to be economically or socially disadvantaged." [48]

The 1975 Report gave particular attention to the § 8 (a) program, expressing disappointment with its limited effectiveness.[49] With specific reference to Government construction contracting, the Report concluded, "there are substantial § 8 (a) opportunities in the area of Federal construction, but . . . the practices of some agencies preclude the realization of this potential." [50] The Subcommittee took "full notice . . . as evidence for its consideration" of reports submitted to the Congress by the General Accounting Office and by the U. S. Commission on Civil Rights, which reflected a similar dissatisfaction with the effectiveness of the § 8 (a) program.[51] The

---

[48] Another chapter of the 1977 Report of the House Committee on Small Business summarized a review of the SBA's Security Bond Guarantee Program, making specific reference to minority business participation in the construction industry:

"The very basic problem disclosed by the testimony is that, over the years, there has developed a business system which has traditionally excluded measurable minority participation. In the past more than the present, this system of conducting business transactions overtly precluded minority input. Currently, we more often encounter a business system which is racially neutral on its face, but because of past overt social and economic discrimination is presently operating, in effect, to perpetuate these past inequities. Minorities, until recently, have not participated to any measurable extent, in our total business system generally, or in the construction industry, in particular." H. R. Rep. No. 94–1791, p. 182 (1977), summarizing H. R. Rep. No. 94–840, p. 17 (1976).

[49] H. R. Rep. No. 94–468, pp. 28–30 (1975).

[50] Id., at 29.

[51] Id., at 11; U. S. General Accounting Office, Questionable Effectiveness of the § 8 (a) Procurement Program, GGD–75–57 (1975); U. S. Comm'n on Civil Rights, Minorities and Women as Government Contractors (May 1975).

Civil Rights Commission report discussed at some length the barriers encountered by minority businesses in gaining access to government contracting opportunities at the federal, state, and local levels. [52]   Among the major difficulties confronting minority businesses were deficiencies in working capital, inability to meet bonding requirements, disabilities caused by an inadequate "track record," lack of awareness of bidding opportunities, unfamiliarity with bidding procedures, preselection before the formal advertising process, and the exercise of discretion by government procurement officers to disfavor minority businesses.[53]

The Subcommittee Report also gave consideration to the operations of the Office of Minority Business Enterprise, an agency of the Department of Commerce organized pursuant to Executive Orders [54] to formulate and coordinate federal efforts to assist the development of minority businesses.   The Report concluded that OMBE efforts were "totally inadequate" to achieve its policy of increasing opportunities for subcontracting by minority businesses on public contracts. OMBE efforts were hampered by a "glaring lack of specific objectives which each prime contractor should be required to achieve," by a "lack of enforcement provisions," and by a "lack of any meaningful monitoring system." [55]

Against this backdrop of legislative and administrative programs, it is inconceivable that Members of both Houses were not fully aware of the objectives of the MBE provision and of the reasons prompting its enactment.

---

[52] *Id.*, at 16–28, 86–88.

[53] *Ibid.*

[54] Exec. Order No. 11458, 3 CFR 779 (1966–1970 Comp.); Exec. Order No. 11625, 3 CFR 616 (1971–1975 Comp.).

[55] H. R. Rep. No. 94–468, p. 32 (1975).   For other congressional observations with respect to the effect of past discrimination on current business opportunities for minorities, see, *e. g.,* H. R. Rep. No. 92–1615, p. 3 (1972); H. R. Rep. No. 95–949, p. 8 (1978); S. Rep. No. 95–1070, pp. 14–15 (1978); S. Rep. No. 96–31, pp. 107, 123–124 (1979); see also, *e. g.,* H. R. Doc. No. 92–169, p. 4 (1971); H. R. Doc. No. 92–194, p. 1 (1972).

## C

Although the statutory MBE provision itself outlines only the bare bones of the federal program, it makes a number of critical determinations: the decision to initiate a limited racial and ethnic preference; the specification of a minimum level for minority business participation; the identification of the minority groups that are to be encompassed by the program; and the provision for an administrative waiver where application of the program is not feasible. Congress relied on the administrative agency to flesh out this skeleton, pursuant to delegated rulemaking authority, and to develop an administrative operation consistent with legislative intentions and objectives.

As required by the Public Works Employment Act of 1977, the Secretary of Commerce promulgated regulations to set into motion "Round II" of the federal grant program.[56] The regulations require that construction projects funded under the legislation must be performed under contracts awarded by competitive bidding, unless the federal administrator has made a determination that in the circumstances relating to a particular project some other method is in the public interest. Where competitive bidding is employed, the regulations echo the statute's requirement that contracts are to be awarded on the basis of the "lowest responsive bid submitted by a bidder meeting established criteria of responsibility," and they also restate the MBE requirement.[57]

EDA also has published guidelines devoted entirely to the administration of the MBE provision. The guidelines outline the obligations of the grantee to seek out all available, qualified, bona fide MBE's, to provide technical assistance as needed, to lower or waive bonding requirements where

---

[56] 91 Stat. 117, 42 U. S. C. § 6706 (1976 ed., Supp. II); 13 CFR Part 317 (1978).

[57] 91 Stat. 116, 42 U. S. C. § 6705 (e)(1) (1976 ed., Supp. II); 13 CFR § 317.19 (1978).

feasible, to solicit the aid of the Office of Minority Business Enterprise, the SBA, or other sources for assisting MBE's in obtaining required working capital, and to give guidance through the intricacies of the bidding process.[58]

EDA regulations contemplate that, as anticipated by Congress, most local public works projects will entail the award of a predominant prime contract, with the prime contractor assuming the above grantee obligations for fulfilling the 10% MBE requirement.[59]   The EDA guidelines specify that when prime contractors are selected through competitive bidding, bids for the prime contract "shall be considered by the Grantee to be responsive only if at least 10 percent of the contract funds are to be expended for MBE's." [60]   The administrative program envisions that competitive incentive will motivate aspirant prime contractors to perform their obligations under the MBE provision so as to qualify as "responsive" bidders.   And, since the contract is to be awarded to the lowest responsive bidder, the same incentive is expected to motivate prime contractors to seek out the most competitive of the available, qualified, bona fide minority firms.   This too is consistent with the legislative intention.[61]

The EDA guidelines also outline the projected administration of applications for waiver of the 10% MBE requirement, which may be sought by the grantee either before or during the bidding process.[62]   The Technical Bulletin issued by EDA discusses in greater detail the processing of waiver requests, clarifying certain issues left open by the guidelines. It specifies that waivers may be total or partial, depending on

---

[58] Guidelines 2–7; App. 157a–160a.   The relevant portions of the Guidelines are set out in the Appendix to this opinion, ¶ 1.

[59] Guidelines 2; App. 157a; see 123 Cong. Rec. 5327–5328 (1977) (remarks of Rep. Mitchell and Rep. Roe).

[60] Guidelines 8; App. 161a.

[61] See 123 Cong. Rec. 5327–5328 (1977) (remarks of Rep. Mitchell and Rep. Roe).

[62] Guidelines 13–16; App. 165a–167a.   The relevant portions of the Guidelines are set out in the Appendix to this opinion, ¶ 2.

the circumstances,[63] and it illustrates the projected operation of the waiver procedure by posing hypothetical questions with projected administrative responses. One such hypothetical is of particular interest, for it indicates the limitations on the scope of the racial or ethnic preference contemplated by the federal program when a grantee or its prime contractor is confronted with an available, qualified, bona fide minority business enterprise who is not the lowest competitive bidder. The hypothetical provides: [64]

> "*Question:* Should a request for waiver of the 10% requirement based on an unreasonable price asked by an MBE ever be granted?
>
> "*Answer:* It is possible to imagine situations where an MBE might ask a price for its product or services that is unreasonable and where, therefore, a waiver is justified. However, before a waiver request will be honored, the following determinations will be made:
>
> "a) The MBE's quote is unreasonably priced. This determination should be based on the nature of the product or service of the subcontractor, the geographic location of the site and of the subcontractor, prices of similar products or services in the relevant market area, and general business conditions in the market area. Furthermore, a subcontractor's price should not be considered unreasonable if he is merely trying to cover his costs because the price results from disadvantage which affects the MBE's cost of doing business or results from discrimination.
>
> "b) The contractor has contacted other MBEs and has no meaningful choice but to accept an unreasonably high price."

This announced policy makes clear the administrative understanding that a waiver or partial waiver is justified (and will

---

[63] Technical Bulletin 5; App. 136a.
[64] Technical Bulletin 9–10; App. 143a.

be granted) to avoid subcontracting with a minority business enterprise at an "unreasonable" price, *i. e.*, a price above competitive levels which cannot be attributed to the minority firm's attempt to cover costs inflated by the present effects of disadvantage or discrimination.

This administrative approach is consistent with the legislative intention. It will be recalled that in the Report of the House Subcommittee on SBA Oversight and Minority Enterprise the Subcommittee took special care to note that when using the term "minority" it intended to include "only such minority individuals as are considered to be economically or socially disadvantaged." [65] The Subcommittee also was cognizant of existing administrative regulations designed to ensure that firms maintained on the lists of bona fide minority business enterprises be those whose competitive position is impaired by the effects of disadvantage and discrimination. In its Report, the Subcommittee expressed its intention that these criteria continue to govern administration of the SBA's § 8 (a) program.[66] The sponsors of the MBE provision, in their reliance on prior administrative practice, intended that the term "minority business enterprise" would be given that same limited application; this even found expression in the legislative debates, where Representative Roe made the point: [67]

> "[W]hen we are talking about companies held by minority groups . . . [c]ertainly people of a variety of backgrounds are included in that. That is not really a measurement. They are talking about people in the minority and deprived."

The EDA Technical Bulletin provides other elaboration of the MBE provision. It clarifies the definition of "minority

---

[65] Text accompanying n. 48, *supra.*

[66] H. R. Rep. No. 94–468, p. 30 (1975).

[67] 123 Cong. Rec. 5330 (1977) (remarks of Rep. Roe).

group members."[68]  It also indicates EDA's intention "to allow credit for utilization of MBEs only for those contracts in which involvement constitutes a basis for strengthening the long-term and continuing participation of the MBE in the construction and related industries."[69]  Finally, the Bulletin outlines a procedure for the processing of complaints of "unjust participation by an enterprise or individuals in the MBE program," or of improper administration of the MBE requirement.[70]

## III

When we are required to pass on the constitutionality of an Act of Congress, we assume "the gravest and most delicate duty that this Court is called on to perform." *Blodgett* v. *Holden,* 275 U. S. 142, 148 (1927) (opinion of Holmes, J.).  A program that employs racial or ethnic criteria, even in a remedial context, calls for close examination; yet we are bound to approach our task with appropriate deference to the Congress, a co-equal branch charged by the Constitution with the power to "provide for the . . . general Welfare of the United States" and "to enforce, by appropriate legislation," the equal protection guarantees of the Fourteenth Amendment.  Art. I, § 8, cl. 1; Amdt. 14, § 5.  In *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 102 (1973), we accorded "great weight to the decisions of Congress" even though the legislation implicated fundamental constitutional rights guaranteed by the First Amendment.  The rule is not different when a congressional program raises equal protection concerns.  See, *e. g., Cleland* v. *National College of Business,* 435 U. S. 213 (1978); *Mathews* v. *De Castro,* 429 U. S. 181 (1976).

[68] Technical Bulletin 1; App. 131a–132a.  These definitions are set out in the Appendix to this opinion, ¶ 3.

[69] Technical Bulletin 3; App. 135a.

[70] Technical Bulletin 19; App. 155a.  The relevant portions of the Technical Bulletin are set out in the Appendix to this opinion, ¶ 4.

Here we pass, not on a choice made by a single judge or a school board, but on a considered decision of the Congress and the President. However, in no sense does that render it immune from judicial scrutiny, and it "is not to say we 'defer' to the judgment of the Congress . . . on a constitutional question," or that we would hesitate to invoke the Constitution should we determine that Congress has overstepped the bounds of its constitutional power. *Columbia Broadcasting, supra,* at 103.

The clear objective of the MBE provision is disclosed by our necessarily extended review of its legislative and administrative background. The program was designed to ensure that, to the extent federal funds were granted under the Public Works Employment Act of 1977, grantees who elect to participate would not employ procurement practices that Congress had decided might result in perpetuation of the effects of prior discrimination which had impaired or foreclosed access by minority businesses to public contracting opportunities. The MBE program does not mandate the allocation of federal funds according to inflexible percentages solely based on race or ethnicity.

Our analysis proceeds in two steps. At the outset, we must inquire whether the *objectives* of this legislation are within the power of Congress. If so, we must go on to decide whether the limited use of racial and ethnic criteria, in the context presented, is a constitutionally permissible *means* for achieving the congressional objectives and does not violate the equal protection component of the Due Process Clause of the Fifth Amendment.

## A

### (1)

In enacting the MBE provision, it is clear that Congress employed an amalgam of its specifically delegated powers. The Public Works Employment Act of 1977, by its very nature, is primarily an exercise of the Spending Power. U. S.

Const., Art. I, § 8, cl. 1. This Court has recognized that the power to "provide for the . . . general Welfare" is an independent grant of legislative authority, distinct from other broad congressional powers. *Buckley* v. *Valeo,* 424 U. S. 1, 90–91 (1976); *United States* v. *Butler,* 297 U. S. 1, 65–66 (1936). Congress has frequently employed the Spending Power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives. This Court has repeatedly upheld against constitutional challenge the use of this technique to induce governments and private parties to cooperate voluntarily with federal policy. *E. g., California Bankers Assn.* v. *Shultz,* 416 U. S. 21 (1974); *Lau* v. *Nichols,* 414 U. S. 563 (1974); *Oklahoma* v. *CSC,* 330 U. S. 127 (1947); *Helvering* v. *Davis,* 301 U. S. 619 (1937); *Steward Machine Co.* v. *Davis,* 301 U. S. 548 (1937).

The MBE program is structured within this familiar legislative pattern. The program conditions receipt of public works grants upon agreement by the state or local governmental grantee that at least 10% of the federal funds will be devoted to contracts with minority businesses, to the extent this can be accomplished by overcoming barriers to access and by awarding contracts to bona fide MBE's. It is further conditioned to require that MBE bids on these contracts are competitively priced, or might have been competitively priced but for the present effects of prior discrimination. Admittedly, the problems of administering this program with respect to these conditions may be formidable. Although the primary responsibility for ensuring minority participation falls upon the grantee, when the procurement practices of the grantee involve the award of a prime contract to a general or prime contractor, the obligations to assure minority participation devolve upon the private contracting party; this is a contractual condition of eligibility for award of the prime contract.

Here we need not explore the outermost limitations on the objectives attainable through such an application of the Spending Power. The reach of the Spending Power, within its sphere, is at least as broad as the regulatory powers of Congress. If, pursuant to its regulatory powers, Congress could have achieved the objectives of the MBE program, then it may do so under the Spending Power. And we have no difficulty perceiving a basis for accomplishing the objectives of the MBE program through the Commerce Power insofar as the program objectives pertain to the action of private contracting parties, and through the power to enforce the equal protection guarantees of the Fourteenth Amendment insofar as the program objectives pertain to the action of state and local grantees.

### (2)

We turn first to the Commerce Power. U. S. Const., Art. I, § 8, cl. 3. Had Congress chosen to do so, it could have drawn on the Commerce Clause to regulate the practices of prime contractors on federally funded public works projects. *Katzenbach* v. *McClung*, 379 U. S. 294 (1964); *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241 (1964). The legislative history of the MBE provision shows that there was a rational basis for Congress to conclude that the subcontracting practices of prime contractors could perpetuate the prevailing impaired access by minority businesses to public contracting opportunities, and that this inequity has an effect on interstate commerce. Thus Congress could take necessary and proper action to remedy the situation. *Ibid.*

It is not necessary that these prime contractors be shown responsible for any violation of antidiscrimination laws. Our cases dealing with application of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, express no doubt of the congressional authority to prohibit practices "challenged as perpetuating the effects of [not unlawful] discrimination occurring prior to the effective date of the Act." *Franks* v.

*Bowman Transportation Co.*, 424 U. S. 747, 761 (1976); see *California Brewers Assn.* v. *Bryant,* 444 U. S. 598 (1980); *Teamsters* v. *United States,* 431 U. S. 324 (1977); *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405 (1975); *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971). Insofar as the MBE program pertains to the actions of private prime contractors, the Congress could have achieved its objectives under the Commerce Clause. We conclude that in this respect the objectives of the MBE provision are within the scope of the Spending Power.

### (3)

In certain contexts, there are limitations on the reach of the Commerce Power to regulate the actions of state and local governments. *National League of Cities* v. *Usery,* 426 U. S. 833 (1976). To avoid such complications, we look to § 5 of the Fourteenth Amendment for the power to regulate the procurement practices of state and local grantees of federal funds. *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976). A review of our cases persuades us that the objectives of the MBE program are within the power of Congress under § 5 "to enforce, by appropriate legislation," the equal protection guarantees of the Fourteenth Amendment.

In *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966), we equated the scope of this authority with the broad powers expressed in the Necessary and Proper Clause, U. S. Const., Art. I, § 8, cl. 18. "Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." 384 U. S., at 651. In *Katzenbach,* the Court upheld § 4 (e) of the Voting Rights Act of 1965, 79 Stat. 439, 42 U. S. C. § 1973b (e), which prohibited application of state English-language literacy requirements to otherwise qualified voters who had completed the sixth grade in an accredited American school in

which a language other than English was the predominant medium of instruction. To uphold this exercise of congressional authority, the Court found no prerequisite that application of a literacy requirement violate the Equal Protection Clause. 384 U. S., at 648–649. It was enough that the Court could perceive a basis upon which Congress could reasonably predicate a judgment that application of literacy qualifications within the compass of § 4 (e) would discriminate in terms of access to the ballot and consequently in terms of access to the provision or administration of governmental programs. *Id.*, at 652–653.

Four years later, in *Oregon* v. *Mitchell*, 400 U. S. 112 (1970), we upheld § 201 of the Voting Rights Act Amendments of 1970, 84 Stat. 315, which imposed a 5-year nationwide prohibition on the use of various · voter-qualification tests and devices in federal, state, and local elections. The Court was unanimous, albeit in separate opinions, in concluding that Congress was within its authority to prohibit the use of such voter qualifications; Congress could reasonably determine that its legislation was an appropriate method of attacking the perpetuation of prior purposeful discrimination, even though the use of these tests or devices might have discriminatory effects only. See *City of Rome* v. *United States,* 446 U. S. 156, 176–177 (1980). Our cases reviewing the parallel power of Congress to enforce the provisions of the Fifteenth Amendment, U. S. Const., Amdt. 15, § 2, confirm that congressional authority extends beyond the prohibition of purposeful discrimination to encompass state action that has discriminatory impact perpetuating the effects of past discrimination. *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966); cf. *City of Rome, supra.*

With respect to the MBE provision, Congress had abundant evidence from which it could conclude that minority businesses have been denied effective participation in public contracting opportunities by procurement practices that perpet-

uated the effects of prior discrimination. Congress, of course, may legislate without compiling the kind of "record" appropriate with respect to judicial or administrative proceedings. Congress had before it, among other data, evidence of a long history of marked disparity in the percentage of public contracts awarded to minority business enterprises. This disparity was considered to result not from any lack of capable and qualified minority businesses, but from the existence and maintenance of barriers to competitive access which had their roots in racial and ethnic discrimination, and which continue today, even absent any intentional discrimination or other unlawful conduct. Although much of this history related to the experience of minority businesses in the area of federal procurement, there was direct evidence before the Congress that this pattern of disadvantage and discrimination existed with respect to state and local construction contracting as well. In relation to the MBE provision, Congress acted within its competence to determine that the problem was national in scope.

Although the Act recites no preambulary "findings" on the subject, we are satisfied that Congress had abundant historical basis from which it could conclude that traditional procurement practices, when applied to minority businesses, could perpetuate the effects of prior discrimination. Accordingly, Congress reasonably determined that the prospective elimination of these barriers to minority firm access to public contracting opportunities generated by the 1977 Act was appropriate to ensure that those businesses were not denied equal opportunity to participate in federal grants to state and local governments, which is one aspect of the equal protection of the laws. Insofar as the MBE program pertains to the actions of state and local grantees, Congress could have achieved its objectives by use of its power under § 5 of the Fourteenth Amendment. We conclude that in this respect the objectives of the MBE provision are within the scope of the Spending Power.

## (4)

There are relevant similarities between the MBE program and the federal spending program reviewed in *Lau* v. *Nichols*, 414 U. S. 563 (1974). In *Lau*, a language barrier "effectively foreclosed" non-English-speaking Chinese pupils from access to the educational opportunities offered by the San Francisco public school system. *Id.*, at 564–566. It had not been shown that this had resulted from any discrimination, purposeful or otherwise, or from other unlawful acts. Nevertheless, we upheld the constitutionality of a federal regulation applicable to public school systems receiving federal funds that prohibited the utilization of "criteria or methods of administration *which have the effect* . . . of defeating òr substantially impairing accomplishment of the objectives of the [educational] program as respect individuals of a particular race, color, or national origin." *Id.*, at 568 (emphasis added). Moreover, we upheld application to the San Francisco school system, as a recipient of federal funds, of a requirement that "[w]here inability to speak and understand the English language excludes national origin-minority group children from effective participation in the educational program offered by a school district, the district must take affirmative steps to rectify the language deficiency in order to open its instructional program to these students." *Ibid.*

It is true that the MBE provision differs from the program approved in *Lau* in that the MBE program directly employs racial and ethnic criteria as a means to accomplish congressional objectives; however, these objectives are essentially the same as those approved in *Lau*. Our holding in *Lau* is instructive on the exercise of congressional authority by way of the MBE provision. The MBE program, like the federal regulations reviewed in *Lau*, primarily regulates state action in the use of federal funds voluntarily sought and accepted by the grantees subject to statutory and administrative conditions. The MBE participation requirement is directed at

the utilization of criteria, methods, or practices thought by Congress to have the effect of defeating, or substantially impairing, access by the minority business community to public funds made available by congressional appropriations.

## B

We now turn to the question whether, as a *means* to accomplish these plainly constitutional objectives, Congress may use racial and ethnic criteria, in this limited way, as a condition attached to a federal grant. We are mindful that "[i]n no matter should we pay more deference to the opinion of Congress than in its choice of instrumentalities to perform a function that is within its power," *National Mutual Insurance Co.* v. *Tidewater Transfer Co.*, 337 U. S. 582, 603 (1949) (opinion of Jackson, J.). However, Congress may employ racial or ethnic classifications in exercising its Spending or other legislative powers only if those classifications do not violate the equal protection component of the Due Process Clause of the Fifth Amendment. We recognize the need for careful judicial evaluation to assure that any congressional program that employs racial or ethnic criteria to accomplish the objective of remedying the present effects of past discrimination is narrowly tailored to the achievement of that goal.

Again, we stress the limited scope of our inquiry. Here we are not dealing with a remedial decree of a court but with the legislative authority of Congress. Furthermore, petitioners have challenged the constitutionality of the MBE provision on its face; they have not sought damages or other specific relief for injury allegedly flowing from specific applications of the program; nor have they attempted to show that as applied in identified situations the MBE provision violated the constitutional or statutory rights of any party to this case.[71] In

[71] In their complaint, in order to establish standing to challenge the validity of the program, petitioners alleged as "[s]pecific examples" of economic injury three instances where one of their number assertedly

these circumstances, given a reasonable construction and in light of its projected administration, if we find the MBE program on its face to be free of constitutional defects, it must be upheld as within congressional power. *Parker* v. *Levy,* 417 U. S. 733, 760 (1974); *Fortson* v. *Dorsey,* 379 U. S. 433, 438–439 (1965); *Aptheker* v. *Secretary of State,* 378 U. S. 500, 515 (1964); see *United States* v. *Raines,* 362 U. S. 17, 20–24 (1960).

Our review of the regulations and guidelines governing administration of the MBE provision reveals that Congress enacted the program as a strictly remedial measure; moreover, it is a remedy that functions prospectively, in the manner of an injunctive decree. Pursuant to the administrative program, grantees and their prime contractors are required to seek out all available, qualified, bona fide MBE's; they are required to provide technical assistance as needed, to lower or waive bonding requirements where feasible, to solicit the aid of the Office of Minority Business Enterprise, the SBA, or other sources for assisting MBE's to obtain required working capital, and to give guidance through the intricacies of the bidding process. *Supra,* at 468–469. The program assumes that grantees who undertake these efforts in good faith will obtain at least 10% participation by minority business enterprises. It is recognized that, to achieve this target, contracts will be awarded to available, qualified, bona fide MBE's even though they are not the lowest competitive bidders, so long as their higher bids, when challenged, are found to reflect merely attempts to cover costs inflated by the present effects of prior disadvantage and discrimination. *Supra,* at 470–471. There is available to the grantee a provision authorized by Congress for administrative waiver on

would have been awarded a public works contract but for enforcement of the MBE provision. Petitioners requested only declaratory and injunctive relief against continued enforcement of the MBE provision; they did not seek any remedy for these specific instances of assertedly unlawful discrimination. App. 12a–13a, 17a–19a.

a case-by-case basis should there be a demonstration that, despite affirmative efforts, this level of participation cannot be achieved without departing from the objectives of the program. *Supra,* at 469–470. There is also an administrative mechanism, including a complaint procedure, to ensure that only bona fide MBE's are encompassed by the remedial program, and to prevent unjust participation in the program by those minority firms whose access to public contracting opportunities is not impaired by the effects of prior discrimination. *Supra,* at 471–472.

### (1)

As a threshold matter, we reject the contention that in the remedial context the Congress must act in a wholly "color-blind" fashion. In *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 18–21 (1971), we rejected this argument in considering a court-formulated school desegregation remedy on the basis that examination of the racial composition of student bodies was an unavoidable starting point and that racially based attendance assignments were permissible so long as no absolute racial balance of each school was required. In *McDaniel* v. *Barresi,* 402 U. S. 39, 41 (1971), citing *Swann,* we observed: "In this remedial process, steps will almost invariably require that students be assigned 'differently because of their race.' Any other approach would freeze the status quo that is the very target of all desegregation processes." (Citations omitted.) And in *North Carolina Board of Education* v. *Swann,* 402 U. S. 43 (1971), we invalidated a state law that absolutely forbade assignment of any student on account of race because it foreclosed implementation of desegregation plans that were designed to remedy constitutional violations. We held that "[j]ust as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy." *Id.,* at 46.

In these school desegregation cases we dealt with the authority of a federal court to formulate a remedy for unconstitutional racial discrimination. However, the authority of a court to incorporate racial criteria into a remedial decree also extends to statutory violations. Where federal antidiscrimination laws have been violated, an equitable remedy may in the appropriate case include a racial or ethnic factor. *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747 (1976); see *Teamsters* v. *United States*, 431 U. S. 324 (1977); *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405 (1975). In another setting, we have held that a state may employ racial criteria that are reasonably necessary to assure compliance with federal voting rights legislation, even though the state action does not entail the remedy of a constitutional violation. *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey*, 430 U. S. 144, 147–165 (1977) (opinion of WHITE, J., joined by BRENNAN, BLACKMUN, and STEVENS, JJ.); *id.*, at 180–187 (BURGER, C. J., dissenting on other grounds).

When we have discussed the remedial powers of a federal court, we have been alert to the limitation that "[t]he power of the federal courts to restructure the operation of local and state governmental entities 'is not plenary. . . .' [A] federal court is required to tailor 'the scope of the remedy' to fit the nature and extent of the . . . violation." *Dayton Board of Education* v. *Brinkman*, 433 U. S. 406, 419–420 (1977) (quoting *Milliken* v. *Bradley*, 418 U. S. 717, 738 (1974), and *Swann* v. *Charlotte-Mecklenburg Board of Education, supra,* at 16).

Here we deal, as we noted earlier, not with the limited remedial powers of a federal court, for example, but with the broad remedial powers of Congress. It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees. Congress not only may induce voluntary action to assure compliance

with existing federal statutory or constitutional antidiscrimination provisions, but also, where Congress has authority to declare certain conduct unlawful, it may, as here, authorize and induce state action to avoid such conduct. *Supra,* at 473–480.

(2)

A more specific challenge to the MBE program is the charge that it impermissibly deprives nonminority businesses of access to at least some portion of the government contracting opportunities generated by the Act. It must be conceded that by its objective of remedying the historical impairment of access, the MBE provision can have the effect of awarding some contracts to MBE's which otherwise might be awarded to other businesses, who may themselves be innocent of any prior discriminatory actions. Failure of nonminority firms to receive certain contracts is, of course, an incidental consequence of the program, not part of its objective; similarly, past impairment of minority-firm access to public contracting opportunities may have been an incidental consequence of "business as usual" by public contracting agencies and among prime contractors.

It is not a constitutional defect in this program that it may disappoint the expectations of nonminority firms. When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such "a sharing of the burden" by innocent parties is not impermissible. *Franks, supra,* at 777; see *Albemarle Paper Co., supra; United Jewish Organizations, supra.* The actual "burden" shouldered by nonminority firms is relatively light in this connection when we consider the scope of this public works program as compared with overall construction contracting opportunities.[72] Moreover, although we may assume that the com-

---

[72] The Court of Appeals relied upon Department of Commerce statistics to calculate that the $4.2 billion in federal grants conditioned upon compliance with the MBE provision amounted to about 2.5% of the total

plaining parties are innocent of any discriminatory conduct, it was within congressional power to act on the assumption that in the past some nonminority businesses may have reaped competitive benefit over the years from the virtual exclusion of minority firms from these contracting opportunities.

(3)

Another challenge to the validity of the MBE program is the assertion that it is underinclusive—that it limits its benefit to specified minority groups rather than extending its remedial objectives to all businesses whose access to government contracting is impaired by the effects of disadvantage or discrimination. Such an extension would, of course, be appropriate for Congress to provide; it is not a function for the courts.

Even in this context, the well-established concept that a legislature may take one step at a time to remedy only part of a broader problem is not without relevance. See *Dandridge* v. *Williams*, 397 U. S. 471 (1970); *Williamson* v. *Lee Optical Co.*, 348 U. S. 483 (1955). We are not reviewing a federal program that seeks to confer a preferred status upon a nondisadvantaged minority or to give special assistance to only one of several groups established to be similarly disadvantaged minorities. Even in such a setting, the Congress is not without a certain authority. See, *e. g., Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S. 256 (1979); *Califano* v. *Webster*, 430 U. S. 313 (1977); *Morton* v. *Mancari*, 417 U. S. 535 (1974).

The Congress has not sought to give select minority groups a preferred standing in the construction industry, but has

---

of nearly $170 billion spent on construction in the United States during 1977. Thus, the 10% minimum minority business participation contemplated by this program would account for only 0.25% of the annual expenditure for construction work in the United States. *Fullilove* v. *Kreps*, 584 F. 2d, at 607.

embarked on a remedial program to place them on a more equitable footing with respect to public contracting opportunities. There has been no showing in this case that Congress has inadvertently effected an invidious discrimination by excluding from coverage an identifiable minority group that has been the victim of a degree of disadvantage and discrimination equal to or greater than that suffered by the groups encompassed by the MBE program. It is not inconceivable that on very special facts a case might be made to challenge the congressional decision to limit MBE eligibility to the particular minority groups identified in the Act. See *Vance* v. *Bradley,* 440 U. S. 93, 109–112 (1979); *Oregon* v. *Mitchell,* 400 U. S., at 240 (opinion of BRENNAN, WHITE, and MARSHALL, JJ.). But on this record we find no basis to hold that Congress is without authority to undertake the kind of limited remedial effort represented by the MBE program. Congress, not the courts, has the heavy burden of dealing with a host of intractable economic and social problems.

### (4)

It is also contended that the MBE program is overinclusive—that it bestows a benefit on businesses identified by racial or ethnic criteria which cannot be justified on the basis of competitive criteria or as a remedy for the present effects of identified prior discrimination. It is conceivable that a particular application of the program may have this effect; however, the peculiarities of specific applications are not before us in this case. We are not presented here with a challenge involving a specific award of a construction contract or the denial of a waiver request; such questions of specific application must await future cases.

This does not mean that the claim of overinclusiveness is entitled to no consideration in the present case. The history of governmental tolerance of practices using racial or ethnic criteria for the purpose or with the effect of imposing an invidious discrimination must alert us to the deleterious

effects of even benign racial or ethnic classifications when they stray from narrow remedial justifications. Even in the context of a facial challenge such as is presented in this case, the MBE provision cannot pass muster unless, with due account for its administrative program, it provides a reasonable assurance that application of racial or ethnic criteria will be limited to accomplishing the remedial objectives of Congress and that misapplications of the program will be promptly and adequately remedied administratively.

It is significant that the administrative scheme provides for waiver and exemption. Two fundamental congressional assumptions underlie the MBE program: (1) that the present effects of past discrimination have impaired the competitive position of businesses owned and controlled by members of minority groups; and (2) that affirmative efforts to eliminate barriers to minority-firm access, and to evaluate bids with adjustment for the present effects of past discrimination, would assure that at least 10% of the federal funds granted under the Public Works Employment Act of 1977 would be accounted for by contracts with available, qualified, bona fide minority business enterprises. Each of these assumptions may be rebutted in the administrative process.

The administrative program contains measures to effectuate the congressional objective of assuring legitimate participation by disadvantaged MBE's. Administrative definition has tightened some less definite aspects of the statutory identification of the minority groups encompassed by the program.[73] There is administrative scrutiny to identify and

---

[73] The MBE provision, 42 U. S. C. § 6705 (f)(2) (1976 ed., Supp. II), classifies as a minority business enterprise any "business at least 50 per centum of which is owned by minority group members or, in the case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members." Minority group members are defined as "citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos and Aleuts." The administrative definitions are set

eliminate from participation in the program MBE's who are not "bona fide" within the regulations and guidelines; for example, spurious minority-front entities can be exposed. A significant aspect of this surveillance is the complaint procedure available for reporting "unjust participation by an enterprise or individuals in the MBE program." *Supra,* at 472. And even as to specific contract awards, waiver is available to avoid dealing with an MBE who is attempting to exploit the remedial aspects of the program by charging an unreasonable price, *i. e.,* a price not attributable to the present effects of past discrimination. *Supra,* at 469–471. We must assume that Congress intended close scrutiny of false claims and prompt action on them.

Grantees are given the opportunity to demonstrate that their best efforts will not succeed or have not succeeded in achieving the statutory 10% target for minority firm participation within the limitations of the program's remedial objectives. In these circumstances a waiver or partial waiver is available once compliance has been demonstrated. A waiver may be sought and granted at any time during the contracting process, or even prior to letting contracts if the facts warrant.

---

out in the Appendix to this opinion, ¶ 3. These categories also are classified as minorities in the regulations implementing the nondiscrimination requirements of the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U. S. C. § 803, see 49 CFR § 265.5 (i) (1978), on which Congress relied as precedent for the MBE provision. See 123 Cong. Rec. 7156 (1977) (remarks of Sen. Brooke). The House Subcommittee on SBA Oversight and Minority Enterprise, whose activities played a significant part in the legislative history of the MBE provision, also recognized that these categories were included within the Federal Government's definition of "minority business enterprise." H. R. Rep. No. 94–468, pp. 20–21 (1975). The specific inclusion of these groups in the MBE provision demonstrates that Congress concluded they were victims of discrimination. Petitioners did not press any challenge to Congress' classification categories in the Court of Appeals; there is no reason for this Court to pass upon the issue at this time.

Nor is the program defective because a waiver may be sought only by the grantee and not by prime contractors who may experience difficulty in fulfilling contract obligations to assure minority participation. It may be administratively cumbersome, but the wisdom of concentrating responsibility at the grantee level is not for us to evaluate; the purpose is to allow the EDA to maintain close supervision of the operation of the MBE provision. The administrative complaint mechanism allows for grievances of prime contractors who assert that a grantee has failed to seek a waiver in an appropriate case. Finally, we note that where private parties, as opposed to governmental entities, transgress the limitations inherent in the MBE program, the possibility of constitutional violation is more removed. See *Steelworkers* v. *Weber*, 443 U. S. 193, 200 (1979).

That the use of racial and ethnic criteria is premised on assumptions rebuttable in the administrative process gives reasonable assurance that application of the MBE program will be limited to accomplishing the remedial objectives contemplated by Congress and that misapplications of the racial and ethnic criteria can be remedied. In dealing with this facial challenge to the statute, doubts must be resolved in support of the congressional judgment that this limited program is a necessary step to effectuate the constitutional mandate for equality of economic opportunity. The MBE provision may be viewed as a pilot project, appropriately limited in extent and duration, and subject to reassessment and re-evaluation by the Congress prior to any extension or re-enactment.[74] Miscarriages of administration could have only a transitory economic impact on businesses not encompassed by the program, and would not be irremediable.

---

[74] Cf. GAO, Report to the Congress, Minority Firms on Local Public Works Projects—Mixed Results, CED-79-9 (Jan. 16, 1979); U. S. Dept. of Commerce, Economic Development Administration, Local Public Works Program Interim Report on 10 Percent Minority Business Enterprise Requirement (Sept. 1978).

## IV

Congress, after due consideration, perceived a pressing need to move forward with new approaches in the continuing effort to achieve the goal of equality of economic opportunity. In this effort, Congress has necessary latitude to try new techniques such as the limited use of racial and ethnic criteria to accomplish remedial objectives; this is especially so in programs where voluntary cooperation with remedial measures is induced by placing conditions on federal expenditures. That the program may press the outer limits of congressional authority affords no basis for striking it down.

Petitioners have mounted a facial challenge to a program developed by the politically responsive branches of Government. For its part, the Congress must proceed only with programs narrowly tailored to achieve its objectives, subject to continuing evaluation and reassessment; administration of the programs must be vigilant and flexible; and, when such a program comes under judicial review, courts must be satisfied that the legislative objectives and projected administration give reasonable assurance that the program will function within constitutional limitations. But as Mr. Justice Jackson admonished in a different context in 1941: [75]

> "The Supreme Court can maintain itself and succeed in its tasks only if the counsels of self-restraint urged most earnestly by members of the Court itself are humbly and faithfully heeded. After the forces of conservatism and liberalism, of radicalism and reaction, of emotion and of self-interest are all caught up in the legislative process and averaged and come to rest in some compromise measure such as the Missouri Compromise, the N. R. A., the A. A. A., a minimum-wage law, or some other legislative policy, a decision striking it down closes an area of compromise in which conflicts have actually, if only

[75] R. Jackson, The Struggle for Judicial Supremacy 321 (1941).

temporarily, been composed. Each such decision takes away from our democratic federalism another of its defenses against domestic disorder and violence. The vice of judicial supremacy, as exerted for ninety years in the field of policy, has been its progressive closing of the avenues to peaceful and democratic conciliation of our social and economic conflicts."

Mr. Justice Jackson reiterated these thoughts shortly before his death in what was to be the last of his Godkin Lectures: [76]

"I have said that in these matters the Court must respect the limitations on its own powers because judicial usurpation is to me no more justifiable and no more promising of permanent good to the country than any other kind. So I presuppose a Court that will not depart from the judicial process, will not go beyond resolving cases and controversies brought to it in conventional form, and will not consciously encroach upon the functions of its coordinate branches."

In a different context to be sure, that is, in discussing the latitude which should be allowed to states in trying to meet social and economic problems, Mr. Justice Brandeis had this to say:

"To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation." *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311 (1932) (dissenting opinion).

Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees. This case is one which requires, and which has received, that kind

[76] R. Jackson, The Supreme Court in the American System of Government 61–62 (1955).

of examination. This opinion does not adopt, either expressly or implicitly, the formulas of analysis articulated in such cases as *University of California Regents* v. *Bakke,* 438 U. S. 265 (1978). However, our analysis demonstrates that the MBE provision would survive judicial review under either "test" articulated in the several *Bakke* opinions. The MBE provision of the Public Works Employment Act of 1977 does not violate the Constitution.[77]

*Affirmed.*

## APPENDIX TO OPINION OF BURGER, C. J.

¶ 1. The EDA Guidelines, at 2–7, provide in relevant part:

"The primary obligation for carrying out the 10% MBE participation requirement rests with EDA Grantees. . . . The Grantee and those of its contractors which will make subcontracts or purchase substantial supplies from other firms (hereinafter referred to as 'prime contractors') must seek out all available *bona fide* MBE's and make every effort to use as many of them as possible on the project.

"An MBE is *bona fide* if the minority group ownership interests are real and continuing and not created solely to meet 10% MBE requirements. For example, the minority group owners or stockholders should possess control over management, interest in capital and interest in earnings commensurate with the percentage of owner-

---

[77] Although the complaint alleged that the MBE program violated several federal statutes, n. 5, *supra,* the only statutory argument urged upon us is that the MBE provision is inconsistent with Title VI of the Civil Rights Act of 1964. We perceive no inconsistency between the requirements of Title VI and those of the MBE provision. To the extent any statutory inconsistencies might be asserted, the MBE provision—the later, more specific enactment—must be deemed to control. See, *e. g., Morton* v. *Mancari,* 417 U S. 535, 550–551 (1974); *Preiser* v. *Rodriguez,* 411 U. S. 475, 489–490 (1973); *Bulova Watch Co.* v. *United States,* 365 U. S. 753, 758 (1961); *United States* v. *Borden Co.,* 308 U. S. 188, 198–202 (1939).

ship on which the claim of minority ownership status is based. . . .

"An MBE is available if the project is located in the market area of the MBE and the MBE can perform project services or supply project materials at the time they are needed. The relevant market area depends on the kind of services or supplies which are needed. . . . EDA will require that Grantees and prime contractors engage MBE's from as wide a market area as is economically feasible.

"An MBE is qualified if it can perform the services or supply the materials that are needed. Grantees and prime contractors will be expected to use MBE's with less experience than available nonminority enterprises and should expect to provide technical assistance to MBE's as needed. Inability to obtain bonding will ordinarily not disqualify an MBE. Grantees and prime contractors are expected to help MBE's obtain bonding, to include MBE's in any overall bond or to waive bonding where feasible. The Small Business Administration (SBA) is prepared to provide a 90% guarantee for the bond of any MBE participating in an LPW [local public works] project. Lack of working capital will not ordinarily disqualify an MBE. SBA is prepared to provide working capital assistance to any MBE participating in an LPW project. Grantees and prime contractors are expected to assist MBE's in obtaining working capital through SBA or otherwise.

". . . [E]very Grantee should make sure that it knows the names, addresses and qualifications of all relevant MBE's which would include the project location in their market areas. . . . Grantees should also hold prebid conferences to which they invite interested contractors and representatives of . . . MBE support organizations.

"Arrangements have been made through the Office of Minority Business Enterprise . . . to provide assistance

to Grantees and prime contractors in fulfilling the 10% MBE requirement. . . .

"Grantees and prime contractors should also be aware of other support which is available from the Small Business Administration. . . .

". . . [T]he Grantee must monitor the performance of its prime contractors to make sure that their commitments to expend funds for MBE's are being fulfilled. . . . Grantees should administer every project tightly. . . ."

¶ 2. The EDA guidelines, at 13–15, provide in relevant part:

"Although a provision for waiver is included under this section of the Act, EDA will only approve a waiver under exceptional circumstances. The Grantee must demonstrate that there are not sufficient, relevant, qualified minority business enterprises whose market areas include the project location to justify a waiver. The Grantee must detail in its waiver request the efforts the Grantee and potential contractors have exerted to locate and enlist MBE's. The request must indicate the specific MBE's which were contacted and the reason each MBE was not used. . . .

.        .        .        .        .

"Only the Grantee can request a waiver. . . . Such a waiver request would ordinarily be made after the initial bidding or negotiation procedures proved unsuccessful. . . .

.        .        .        .        .

"[A] Grantee situated in an area where the minority population is very small may apply for a waiver before requesting bids on its project or projects. . . ."

¶ 3. The EDA Technical Bulletin, at 1, provides the following definitions:

"a) Negro—An individual of the black race of African origin.

"b) Spanish-speaking—An individual of a Spanish-speaking culture and origin or parentage.

"c) Oriental—An individual of a culture, origin or parentage traceable to the areas south of the Soviet Union, East of Iran, inclusive of islands adjacent thereto, and out to the Pacific including but not limited to Indonesia, Indochina, Malaysia, Hawaii and the Philippines.

"d) Indian—An individual having origins in any of the original people of North America and who is recognized as an Indian by either a tribe, tribal organization or a suitable authority in the community. (A suitable authority in the community may be: educational institutions, religious organizations, or state agencies.)

"e) Eskimo—An individual having origins in any of the original peoples of Alaska.

"f) Aleut—An individual having origins in any of the original peoples of the Aleutian Islands."

¶ 4. The EDA Technical Bulletin, at 19, provides in relevant part:

"Any person or organization with information indicating unjust participation by an enterprise or individuals in the MBE program or who believes that the MBE participation requirement is being improperly applied should contact the appropriate EDA grantee and provide a detailed statement of the basis for the complaint.

"Upon receipt of a complaint, the grantee should attempt to resolve the issues in dispute. In the event the grantee requires assistance in reaching a determination, the grantee should contact the Civil Rights Specialist in the appropriate Regional Office.

"If the complainant believes that the grantee has not satisfactorily resolved the issues raised in his complaint, he may personally contact the EDA Regional Office."

MR. JUSTICE POWELL, concurring.

Although I would place greater emphasis than THE CHIEF JUSTICE on the need to articulate judicial standards of review

in conventional terms, I view his opinion announcing the judgment as substantially in accord with my own views. Accordingly, I join that opinion and write separately to apply the analysis set forth by my opinion in *University of California Regents* v. *Bakke,* 438 U. S. 265 (1978) (hereinafter *Bakke*).

The question in this case is whether Congress may enact the requirement in § 103 (f)(2) of the Public Works Employment Act of 1977 (PWEA), that 10% of federal grants for local public work projects funded by the Act be set aside for minority business enterprises. Section 103 (f)(2) employs a racial classification that is constitutionally prohibited unless it is a necessary means of advancing a compelling governmental interest. *Bakke, supra,* at 299, 305; see *In re Griffiths,* 413 U. S. 717, 721–722 (1973); *Loving* v. *Virginia,* 388 U. S. 1, 11 (1967); *McLaughlin* v. *Florida,* 379 U. S. 184, 196 (1964). For the reason stated in my *Bakke* opinion, I consider adherence to this standard as important and consistent with precedent.

The Equal Protection Clause, and the equal protection component of the Due Process Clause of the Fifth Amendment, demand that any governmental distinction among groups must be justifiable. Different standards of review applied to different sorts of classifications simply illustrate the principle that some classifications are less likely to be legitimate than others. Racial classifications must be assessed under the most stringent level of review because immutable characteristics, which bear no relation to individual merit or need, are irrelevant to almost every governmental decision. See, *e. g., Anderson* v. *Martin,* 375 U. S. 399, 402–404 (1964). In this case, however, I believe that § 103 (f)(2) is justified as a remedy that serves the compelling governmental interest in eradicating the continuing effects of past discrimination identified by Congress.[1]

---

[1] Although racial classifications require strict judicial scrutiny, I do not agree that the Constitution prohibits all racial classification. Mr. Jus-

## I

Racial preference never can constitute a compelling state interest. " 'Distinctions between citizens solely because of their ancestry' [are] 'odious to a free people whose institutions are founded upon the doctrine of equality.' " *Loving* v. *Virginia, supra,* at 11, quoting *Hirabayashi* v. *United States,* 320 U. S. 81, 100 (1943). Thus, if the set-aside merely expresses a congressional desire to prefer one racial or ethnic group over another, § 103 (f)(2) violates the equal protection component in the Due Process Clause of the Fifth Amendment. See *Bolling* v. *Sharpe,* 347 U. S. 497, 499 (1954).

The Government does have a legitimate interest in ameliorating the disabling effects of identified discrimination. *Bakke, supra,* at 307; see, *e. g., Keyes* v. *School District No. 1, Denver, Colo.,* 413 U. S. 189, 236 (1973) (POWELL, J., concurring in part and dissenting in part); *McDaniel* v. *Barresi,* 402 U. S. 39, 41 (1971); *North Carolina Board of Education* v. *Swann,* 402 U. S. 43, 45–46 (1971); *Green* v. *County School Board,* 391 U. S. 430, 437–438 (1968). The existence of illegal discrimination justifies the imposition of a remedy that will "make persons whole for injuries suffered on account of unlawful . . . discrimination." *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 418 (1975). A critical inquiry, therefore, is whether § 103 (f)(2) was enacted as a means of redressing such discrimination. But this Court has never approved race-conscious remedies absent judicial, administrative, or legislative findings of constitutional or statutory violations. *Bakke, supra,* at 307; see, *e. g., Teamsters* v. *United*

---

TICE STEWART recognizes the principle that I believe is applicable: "Under our Constitution, any official action that treats a person differently on account of his race or ethnic origin is inherently suspect and presumptively invalid." *Post,* at 523. But, in narrowly defined circumstances, that presumption may be rebutted. Cf. *Lee* v. *Washington,* 390 U. S. 333, 334 (1968) (Black, Harlan, and STEWART, JJ., concurring).

*States,* 431 U. S. 324, 367–376 (1977); *United Jewish Organizations* v. *Carey,* 430 U. S. 144, 155–159 (1977) (opinion of WHITE, J.); *South Carolina* v. *Katzenbach,* 383 U. S. 301, 308–315 (1966).

Because the distinction between permissible remedial action and impermissible racial preference rests on the existence of a constitutional or statutory violation, the legitimate interest in creating a race-conscious remedy is not compelling unless an appropriate governmental authority has found that such a violation has occurred. In other words, two requirements must be met. First, the governmental body that attempts to impose a race-conscious remedy must have the authority to act in response to identified discrimination. Cf. *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 103 (1976). Second, the governmental body must make findings that demonstrate the existence of illegal discrimination. In *Bakke,* the Regents failed both requirements. They were entrusted only with educational functions, and they made no findings of past discrimination. Thus, no compelling governmental interest was present to justify the use of a racial quota in medical school admissions. *Bakke, supra,* at 309–310.

Our past cases also establish that even if the government proffers a compelling interest to support reliance upon a suspect classification, the means selected must be narrowly drawn to fulfill the governmental purpose. *In re Griffiths, supra,* at 721–722. In *Bakke,* for example, the state university did have a compelling interest in the attainment of a diverse student body. But the method selected to achieve that end, the use of a fixed admissions quota, was not appropriate. The Regents' quota system eliminated some nonminority applicants from all consideration for a specified number of seats in the entering class, although it allowed minority applicants to compete for all available seats. 438 U. S., at 275–276. In contrast, an admissions program that recognizes race as a factor, but not the sole factor, in assessing an applicant's qualifications serves the university's interest in di-

versity while ensuring that each applicant receives fair and competitive consideration. *Id.,* at 317–318.

In reviewing the constitutionality of § 103 (f)(2), we must decide: (i) whether Congress is competent to make findings of unlawful discrimination; (ii) if so, whether sufficient findings have been made to establish that unlawful discrimination has affected adversely minority business enterprises, and (iii) whether the 10% set-aside is a permissible means for redressing identifiable past discrimination. None of these questions may be answered without explicit recognition that we are reviewing an Act of Congress.

## II

The history of this Court's review of congressional action demonstrates beyond question that the National Legislature is competent to find constitutional and statutory violations. Unlike the Regents of the University of California, Congress properly may—and indeed must—address directly the problems of discrimination in our society. See *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 257 (1964). In *Katzenbach* v. *McClung,* 379 U. S. 294, 304 (1964), for example, this Court held that Congress had the power under the Commerce Clause to prohibit racial discrimination in public restaurants on the basis of its "finding[s] that [such discrimination] had a direct and adverse effect on the free flow of interstate commerce."

Similarly, after hearing "overwhelming" evidence of private employment discrimination, see H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 2, p. 26 (1963), Congress enacted Title VII of the Civil Rights Act of 1964 in order "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 800 (1973). Acting to further the purposes of Title VII Congress vested in the federal courts broad equitable discretion

to ensure that " 'persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination.' " *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747, 764 (1976), quoting Section-by-Section Analysis of H. R. 1746, accompanying the Equal Employment Opportunity Act of 1972—Conference Report, 118 Cong. Rec. 7166, 7168 (1972).

In addition, Congress has been given the unique constitutional power of legislating to enforce the provisions of the Thirteenth, Fourteenth, and Fifteenth Amendments.[2] At an early date, the Court stated that "[i]t is the power of Congress which has been enlarged" by the enforcement provisions of the post-Civil War Amendments. *Ex parte Virginia,* 100 U. S. 339, 345 (1880). In *Jones* v. *Alfred H. Mayer & Co.,* 392 U. S. 409, 441–443 (1968), the Court recognized Congress' competence to determine that private action inhibiting the right to acquire and convey real property was racial discrimination forbidden by the Thirteenth Amendment. Subsequently, we held that Congress' enactment of 42 U. S. C. § 1981 pursuant to its powers under the Thirteenth Amendment, see *Runyon* v. *McCrary,* 427 U. S. 160, 168–170, 179 (1976), provides to all persons a federal remedy for racial discrimination in private employment. See *McDonald* v. *Sante Fe Transportation Co.,* 427 U. S. 273, 295–296 (1976); *Johnson* v. *Railway Express Agency, Inc.,* 421 U. S. 454, 459–460 (1975).

In *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966), the Court considered whether § 5 of the Fourteenth Amendment gave Congress the power to enact § 4 (e) of the Voting Rights Act of 1965, 42 U. S. C. § 1973b (e). Section 4 (e) provides

---

[2] Section 2 of the Thirteenth Amendment, which abolished slavery, provides that "Congress shall have power to enforce this article by appropriate legislation." In virtually identical language, § 5 of the Fourteenth Amendment and § 2 of the Fifteenth Amendment give Congress the power to enforce the provisions of those Amendments.

that no person educated in Puerto Rico may be denied the right to vote in any election for failure to read or write the English language. The Court held that Congress was empowered to enact § 4 (e) as a remedy for discrimination against the Puerto Rican community. 384 U. S., at 652–653. Implicit in its holding was the Court's belief that Congress had the authority to find, and had found, that members of this minority group had suffered governmental discrimination.

Congress' authority to find and provide for the redress of constitutional violations also has been confirmed in cases construing the Enforcement Clause of the Fifteenth Amendment. In *South Carolina* v. *Katzenbach,* 383 U. S., at 308, for example, the Court upheld the Voting Rights Act of 1965, 42 U. S. C. § 1973 *et seq.,* as an appropriate remedy for violations of the Fifteenth Amendment. It noted that Congress had found "insidious and pervasive" discrimination demanding "ster[n] and . . . elaborate" measures. 383 U. S., at 309. Most relevant to our present inquiry was the Court's express approval of Congress' decision to "prescrib[e] remedies for voting discrimination which go into effect without the need for prior adjudication." *Id.,* at 327–328.[3]

---

[3] Among the remedies approved in *South Carolina* v. *Katzenbach* was the temporary suspension of literacy tests in some jurisdictions. The Voting Rights Act Amendments of 1970, 42 U. S. C. § 1973aa *et seq.,* temporarily banned the use of literacy tests in all jurisdictions In *Oregon* v. *Mitchell,* 400 U. S. 112 (1970), this Court, speaking through five separate opinions, unanimously upheld that action as a proper exercise of Congress' authority under the post-Civil War Amendments. See *id.,* at 117 (Black, J.); *id.,* at 135 (Douglas, J.); *id.,* at 152 (Harlan, J.); *id.,* at 229 (BRENNAN, WHITE, and MARSHALL, JJ.); *id.,* at 281 (STEWART, J., with whom BURGER, C. J. and BLACKMUN, J., concurred). MR. JUSTICE STEWART said:

"Congress was not required to make state-by-state findings concerning . . . actual impact of literacy requirements on the Negro citizen's access to the ballot box. In the interests of uniformity, Congress may paint with a much broader brush than may this Court, which must confine itself to the judicial function of deciding individual cases and controversies upon

It is beyond question, therefore, that Congress has the authority to identify unlawful discriminatory practices, to prohibit those practices, and to prescribe remedies to eradicate their continuing effects. The next inquiry is whether Congress has made findings adequate to support its determination that minority contractors have suffered extensive discrimination.

## III

### A

The petitioners contend that the legislative history of § 103 (f) (2) reflects no congressional finding of statutory or constitutional violations. Crucial to that contention is the assertion that a reviewing court may not look beyond the legislative history of the PWEA itself for evidence that Congress believed it was combating invidious discrimination. But petitioners' theory would erect an artificial barrier to full understanding of the legislative process.

Congress is not an adjudicatory body called upon to resolve specific disputes between competing adversaries. Its constitutional role is to be representative rather than impartial, to make policy rather than to apply settled principles of law. The petitioners' contention that this Court should treat the debates on § 103 (f) (2) as the complete "record" of congressional decisionmaking underlying that statute is essentially a plea that we treat Congress as if it were a lower federal court. But Congress is not expected to act as though it were duty bound to find facts and make conclusions of law. The creation of national rules for the governance of our society simply does not entail the same concept of recordmaking that is appropriate to a judicial or administrative proceeding. Congress has no responsibility to confine its vision to the facts and evidence adduced by particular parties. Instead, its special

---

individual records. The findings that Congress made when it enacted the Voting Rights Act of 1965 would have supported a nationwide ban on literacy tests." *Id.,* at 284 (citation omitted).

attribute as a legislative body lies in its broader mission to investigate and consider all facts and opinions that may be relevant to the resolution of an issue. One appropriate source is the information and expertise that Congress acquires in the consideration and enactment of earlier legislation. After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in that area.

Acceptance of petitioners' argument would force Congress to make specific factual findings with respect to each legislative action. Such a requirement would mark an unprecedented imposition of adjudicatory procedures upon a coordinate branch of Government. Neither the Constitution nor our democratic tradition warrants such a constraint on the legislative process. I therefore conclude that we are not confined in this case to an examination of the legislative history of § 103 (f)(2) alone. Rather, we properly may examine the total contemporary record of congressional action dealing with the problems of racial discrimination against minority business enterprises.

## B

In my view, the legislative history of § 103 (f)(2) demonstrates that Congress reasonably concluded that private and governmental discrimination had contributed to the negligible percentage of public contracts awarded minority contractors.[4]

---

[4] I cannot accept the suggestion of the Court of Appeals that § 103 (f)(2) must be viewed as serving a compelling state interest if the reviewing court can "perceive a basis" for legislative action. *Fullilove* v. *Kreps*, 584 F. 2d 600, 604–605 (1978), quoting *Katzenbach* v. *Morgan*, 384 U. S. 641, 656 (1966). The "perceive a basis" standard refers to congressional authority to act, not to the distinct question whether that action violates the Due Process Clause of the Fifth Amendment.

In my view, a court should uphold a reasonable congressional finding of discrimination. A more stringent standard of review would impinge upon Congress' ability to address problems of discrimination, see *supra*, at 500–503; a standard requiring a court to "perceive a basis" is essentially

The opinion of THE CHIEF JUSTICE provides a careful overview of the relevant legislative history, see *ante,* at 456–467, to which only a few words need be added.

Section 103 (f)(2) originated in an amendment introduced on the floor of the House of Representatives by Representative Mitchell. Congressman Mitchell noted that the Federal Government was already operating a set-aside program under § 8 (a) of the Small Business Act, 15 U. S. C. § 637 (a). He described his proposal as "the only sensible way for us to begin to develop a viable economic system for minorities in this country, with the ultimate result being that we are going to eventually be able to . . . end certain programs which are merely support survival programs for people which do not contribute to the economy." 123 Cong. Rec. 5327 (1977).[5] Senator Brooke, who introduced a similar measure in the Senate, reminded the Senate of the special provisions previously enacted into § 8 (a) of the Small Business Act and the Railroad Revitalization and Regulatory Reform Act of 1976, 90 Stat. 149, 49 U. S. C. § 1657a, which, he stated, demonstrated the validity of his amendment. 123 Cong. Rec. 7155–7156 (1977).

Section 8 (a) of the Small Business Act provides that the Small Business Administration may enter into contracts with the Federal Government and subcontract them out to small businesses. The Small Business Administration has been directed by Executive Order to employ § 8 (a) to aid socially and economically disadvantaged persons. *Ante,* at 463–464.[6]

---

meaningless in this context. Such a test might allow a court to justify legislative action even in the absence of affirmative evidence of congressional findings.

[5] During subsequent debate in the House, Representative Conyers emphasized that minority businesses "through no fault of their own simply have not been able to get their foot in the door." 123 Cong. Rec. 5330 (1977); see *id.,* at 5331 (remarks of Rep. Biaggi).

[6] In 1969, 1970, and 1971, the President issued Executive Orders directing federal aid for minority business enterprises. See Exec. Order No.

The operation of the § 8 (a) program was reviewed by congressional Committees between 1972 and 1977. In 1972, the House Subcommittee on Minority Small Business Enterprise found that minority businessmen face economic difficulties that "are the result of past social standards which linger as characteristics of minorities as a group." H. R. Rep. No. 92–1615, p. 3 (1972). In 1975, the House Subcommittee on SBA Oversight and Minority Enterprise concluded that "[t]he effect of past inequities stemming from racial prejudice have not remained in the past," and that low participation by minorities in the economy was the result of "past discriminatory practices." H. R. Rep. No. 94–468, pp. 1–2 (1975). In 1977, the House Committee on Small Business found that

> "over the years, there has developed a business system which has traditionally excluded measurable minority participation. In the past more than the present, this system of conducting business transactions overtly precluded minority input. Currently, we more often encounter a business system which is racially neutral on its face, but because of past overt social and economic discrimination is presently operating, in effect, to perpetuate these past inequities." H. R. Rep. No. 94–1791, p. 182 (1977).

11458, 3 CFR 779 (1966–1970 Comp.); Exec. Order No. 11518, 3 CFR 907 (1966–1970 Comp.); Exec. Order No. 11625, 3 CFR 616 (1971–1975 Comp.). The President noted that "members of certain minority groups through no fault of their own have been denied the full opportunity to [participate in the free enterprise system]," Exec. Order No. 11518, 3 CFR 908 (1966–1970 Comp.), and that the "opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential if we are to obtain social and economic justice." Exec. Order No. 11625, 3 CFR 616 (1971–1975 Comp.). Assistance to minority business enterprises through the § 8 (a) program has been designed to promote the goals of these Executive Orders. *Ray Baillie Trash Hauling, Inc.* v. *Kleppe,* 477 F. 2d 696, 706 (CA5 1973), cert. denied, 415 U. S. 914 (1974).

The Committee's Report was issued on January 3, 1977, less than two months before Representative Mitchell introduced § 103 (f)(2) into the House of Representatives.[7]

In light of these legislative materials and the discussion of legislative history contained in THE CHIEF JUSTICE's opinion, I believe that a court must accept as established the conclusion that purposeful discrimination contributed significantly to the small percentage of federal contracting funds that minority business enterprises have received. Refusals to subcontract work to minority contractors may, depending upon the identity of the discriminating party, violate Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.,* or 42 U. S. C. § 1981, or the Fourteenth Amendment. Although the discriminatory activities were not identified with the exactitude expected in judicial or administrative adjudication, it must be remembered that "Congress may paint with a much broader brush than may this Court. . . ." *Oregon* v. *Mitchell,* 400 U. S. 112, 284 (1970) (STEWART, J., concurring in part and dissenting in part).[8]

---

[7] Two sections of the Railroad Revitalization and Regulatory Reform Act also reflect Congress' recognition of the need for remedial steps on behalf of minority businesses. Section 905, 45 U. S. C. § 803, prohibits discrimination in any activity funded by the Act, and § 906, 49 U. S. C. § 1657a, establishes a Minority Resource Center to assist minority businessmen to obtain contracts and business opportunities related to the maintenance and rehabilitation of railroads. The provisions were enacted by a Congress that recognized the "established national policy, since at least the passage of the Civil Rights Act of 1964, to encourage and assist in the development of minority business enterprise." S. Rep. No. 94–499, p. 44 (1975) (Commerce Committee). In January 1977, the Department of Transportation issued regulations pursuant to 45 U. S. C. § 803 (d) that require contractors to formulate affirmative-action programs to ensure that minority businesses receive a fair proportion of contract opportunities. See 49 CFR §§ 265.9–265.17 (1978). See also nn. 11 and 12, *infra.*

[8] Although this record suffices to support the congressional judgment that minority contractors suffered identifiable discrimination, Congress need not be content with findings that merely meet constitutional standards. Race-conscious remedies, popularly referred to as affirmative-action

## IV

Under this Court's established doctrine, a racial classification is suspect and subject to strict judicial scrutiny. As noted in Part I, the government may employ such a classification only when necessary to accomplish a compelling governmental purpose. See *Bakke,* 438 U. S., at 305. The conclusion that Congress found a compelling governmental interest in redressing identified discrimination against minority contractors therefore leads to the inquiry whether use of a 10% set-aside is a constitutionally appropriate means of serving that interest. In the past, this "means" test has been virtually impossible to satisfy. Only two of this Court's modern cases have held the use of racial classifications to be constitutional. See *Korematsu* v. *United States,* 323 U. S. 214 (1944); *Hirabayshi* v. *United States,* 320 U. S. 81 (1943). Indeed, the failure of legislative action to survive strict scrutiny has led some to wonder whether our review of racial classifications has been strict in theory, but fatal in fact. See Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1, 8 (1972).

## A

Application of the "means" test necessarily demands an understanding of the type of congressional action at issue. This is not a case in which Congress has employed a racial classification solely as a means to confer a racial preference. Such a purpose plainly would be unconstitutional. *Supra,*

---

programs, almost invariably affect some innocent persons. See *infra,* at 514. Respect and support for the law, especially in an area as sensitive as this, depend in large measure upon the public's perception of fairness. See *Bakke,* 438 U. S. 265, 319, n. 53 (1978); J. Wilkinson, From *Brown* to *Bakke* 264–266 (1979); Perry, Modern Equal Protection: A Conceptualization and Appraisal, 79 Colum. L. Rev. 1023, 1048–1049 (1979). It therefore is important that the legislative record supporting race-conscious remedies contain evidence that satisfies fairminded people that the congressional action is just.

at 497. Nor has Congress sought to employ a racially conscious means to further a nonracial goal. In such instances, a nonracial means should be available to further the legitimate governmental purpose. See *Bakke, supra,* at 310–311.

Enactment of the set-aside is designed to serve the compelling governmental interest in redressing racial discrimination. As this Court has recognized, the implementation of any affirmative remedy for redress of racial discrimination is likely to affect persons differently depending upon their race. See, *e. g., North Carolina Board of Education* v. *Swann,* 402 U. S., at 45–46. Although federal courts may not order or approve remedies that exceed the scope of a constitutional violation, see *Milliken* v. *Bradley,* 433 U. S. 267, 280–281 (1977); *Dayton Board of Education* v. *Brinkman,* 433 U. S. 406 (1977); *Austin Independent School District* v. *United States,* 429 U. S. 990, 991 (1976) (POWELL, J., concurring), this Court has not required remedial plans to be limited to the least restrictive means of implementation. We have recognized that the choice of remedies to redress racial discrimination is "a balancing process left, within appropriate constitutional or statutory limits, to the sound discretion of the trial court." *Franks* v. *Bowman Transportation Co.,* 424 U. S., at 794 (POWELL, J., concurring in part and dissenting in part).

I believe that the Enforcement Clauses of the Thirteenth and Fourteenth Amendments give Congress a similar measure of discretion to choose a suitable remedy for the redress of racial discrimination. The legislative history of § 5 of the Fourteenth Amendment is particularly instructive. Senator Howard, the member of the Joint Committee on Reconstruction who introduced the Amendment into the Senate, described § 5 as "a direct affirmative delegation of power to Congress to carry out all the principles of all [the] guarantees" of § 1 of the Amendment. Cong. Globe, 39th Cong., 1st Sess., 2766 (1866). Furthermore, he stated that § 5

> "casts upon the Congress the responsibility of seeing to it, for the future, that all the sections of the amendment

are carried out in good faith, and that no State infringes the rights of persons or property. I look upon this clause as indispensable for the reason that it thus imposes upon the Congress this power and this duty." *Id..* at 2768.

Senator Howard's emphasis on the importance of congressional action to effectuate the goals of the Fourteenth Amendment was echoed by other Members of Congress. Representative Stevens, also a member of the Reconstruction Committee, said that the Fourteenth Amendment "allows Congress to correct the unjust legislation of the States," *id.,* at 2459, and Senator Poland wished to leave no doubt "as to the power of Congress to enforce principles lying at the very foundation of all republican government. . . ." *Id.,* at 2961. See *id.,* at 2512–2513 (remarks of Rep. Raymond); *id.,* at 2511 (Rep. Eliot); *Ex parte Virginia,* 100 U. S., at 345.[9]

Although the Framers of the Fourteenth Amendment may have contemplated that Congress, rather than the federal courts, would be the prime force behind enforcement of the Fourteenth Amendment, see 6 C. Fairman, History of the Supreme Court of the United States: Reconstruction and Reunion, Part 1, pp. 1295, 1296 (1971), they did not believe that congressional action would be unreviewable by this Court. Several Members of Congress emphasized that a primary purpose of the Fourteenth Amendment was to place the provisions of the Civil Rights Act of 1866 "in the eternal firmament of the Constitution." Cong. Globe, 39th Cong., 1st Sess., 2462 (1866) (remarks of Rep. Garfield). See *id.,* at 2459 (remarks of Rep. Stevens); *id.,* at 2465 (remarks of Rep. Thayer); *id.,* at 2498 (remarks of Rep. Broomall). By 1866, Members of Congress fully understood that judicial review was the means by which action of the Legislative and Execu-

---

[9] See also *Jones* v. *Alfred H. Mayer & Co.,* 392 U. S. 409, 440–441 (1968), quoting Cong. Globe, 39th Cong., 1st Sess., 322 (1866) (remarks of Sen. Trumbull on Congress' authority under the Thirteenth Amendment).

tive Branches would be required to conform to the Constitution. See, *e. g., Marbury* v. *Madison,* 1 Cranch 137 (1803).

I conclude, therefore, that the Enforcement Clauses of the Thirteenth and Fourteenth Amendments confer upon Congress the authority to select reasonable remedies to advance the compelling state interest in repairing the effects of discrimination. But that authority must be exercised in a manner that does not erode the guarantees of these Amendments. The Judicial Branch has the special responsibility to make a searching inquiry into the justification for employing a race-conscious remedy. Courts must be sensitive to the possibility that less intrusive means might serve the compelling state interest equally as well. I believe that Congress' choice of a remedy should be upheld, however, if the means selected are equitable and reasonably necessary to the redress of identified discrimination. Such a test allows the Congress to exercise necessary discretion but preserves the essential safeguard of judicial review of racial classifications.

## B

When reviewing the selection by Congress of a race-conscious remedy, it is instructive to note the factors upon which the Courts of Appeals have relied in a closely analogous area. Courts reviewing the proper scope of race-conscious hiring remedies have considered (i) the efficacy of alternative remedies, *NAACP* v. *Allen,* 493 F. 2d 614, 619 (CA5 1974); *Vulcan Society Inc.* v. *Civil Service Comm'n,* 490 F. 2d 387, 398 (CA2 1973), (ii) the planned duration of the remedy, *id.,* at 399; *United States* v. *Wood, Wire & Metal Lathers Local 46,* 471 F. 2d 408, 414, n. 12 (CA2), cert. denied, 412 U. S. 939 (1973), (iii) the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force, *Association Against Discrimination* v. *Bridgeport,* 594 F. 2d 306, 311 (CA2 1979); *Boston Chapter NAACP* v. *Beecher,* 504 F. 2d 1017, 1026–1027 (CA1 1974), cert. denied,

421 U. S. 910 (1975); *Bridgeport Guardians, Inc.* v. *Bridge-port Civil Service Comm'n,* 482 F. 2d 1333, 1341 (CA2 1973), cert. denied, 421 U. S. 991 (1975); *Carter* v. *Gallagher,* 452 F. 2d 315, 331 (CA8) (en banc), cert. denied, 406 U. S. 950 (1972), and (iv) the availability of waiver provisions if the hiring plan could not be met, *Associated General Contractors, Inc.* v. *Altshuler,* 490 F. 2d 9, 18–19 (CA1 1973), cert. denied, 416 U. S. 957 (1974).

By the time Congress enacted § 103 (f)(2) in 1977, it knew that other remedies had failed to ameliorate the effects of racial discrimination in the construction industry. Although the problem had been addressed by antidiscrimination legislation, executive action to remedy employment discrimination in the construction industry, and federal aid to minority businesses, the fact remained that minority contractors were receiving less than 1% of federal contracts. See 123 Cong. Rec. 7156 (1977) (remarks of Sen. Brooke). Congress also knew that economic recession threatened the construction industry as a whole. Section 103 (f)(2) was enacted as part of a bill designed to stimulate the economy by appropriating $4 billion in federal funds for new public construction. Since the emergency public construction funds were to be distributed quickly,[10] any remedial provision designed to prevent those funds from perpetuating past discrimination also had to be effective promptly. Moreover, Congress understood that any effective remedial program had to provide minority contractors the experience necessary for continued success without federal assistance.[11] And Congress knew that the

---

[10] The PWEA provides that federal moneys be committed to state and local grantees by September 30, 1977. 42 U. S. C. § 6707 (h)(1) (1976 ed., Supp. II). Action on applications for funds was to be taken within 60 days after receipt of the application, § 6706, and on-site work was to begin within 90 days of project approval, § 6705 (d).

[11] In 1972, a congressional oversight Committee addressed the "complex problem—how to achieve economic prosperity despite a long history of racial bias." See H. R. Rep. No. 92–1615, p. 3 (1972) (Select Committee on

ability of minority group members to gain experience had been frustrated by the difficulty of entering the construction trades.[12]   The set-aside program adopted as part of this emer-

Small Business).   The Committee explained how the effects of discrimination translate into economic barriers:

"In attempting to increase their participation as entrepreneurs in our economy, the minority businessman usually encounters several major problems.   These problems, which are economic in nature, are the result of past social standards which linger as characteristics of minorities as a group.

"The minority entrepreneur is faced initially with the lack of capital, the most serious problem of all beginning minorities or other entrepreneurs. Because minorities as a group are not traditionally holders of large amounts of capital, the entrepreneur must go outside his community in order to obtain the needed capital.   Lending firms require substantial security and a track record in order to lend funds, security which the minority businessmen usually cannot provide.   Because he cannot produce either, he is often turned down.

"Functional expertise is a necessity for the successful operation of any enterprise.   Minorities have traditionally assumed the role of the labor force in business with few gaining access to positions whereby they could learn not only the physical operation of the enterprise, but also the internal functions of management."   *Id.*, at 3–4.

[12] When Senator Brooke introduced the PWEA set-aside in the Senate, he stated that aid to minority businesses also would help to alleviate problems of minority unemployment.   123 Cong. Rec. 7156 (1977).   Congress had considered the need to remedy employment discrimination in the construction industry when it refused to override the "Philadelphia Plan." The "Philadelphia Plan," promulgated by the Department of Labor in 1969, required all federal contractors to use hiring goals in order to redress past discrimination.   See *Contractors Association of Eastern Pennsylvania* v. *Secretary of Labor,* 442 F. 2d 159, 163 (CA3), cert. denied, 404 U. S. 854 (1971).   Later that year, the House of Representatives refused to adopt an amendment to an appropriations bill that would have had the effect of overruling the Labor Department's order.   115 Cong. Rec. 40921 (1969).   The Senate, which had approved such an amendment, then voted to recede from its position.   *Id.*, at 40749.

During the Senate debate, several legislators argued that implementation of the Philadelphia Plan was necessary to ensure equal opportunity. See *id.*, at 40740 (remarks of Sen. Scott); *id.*, at 40741 (remarks of

gency legislation serves each of these concerns because it takes effect as soon as funds are expended under PWEA and because it provides minority contractors with experience that could enable them to compete without governmental assistance.

The § 103 (f) (2) set-aside is not a permanent part of federal contracting requirements. As soon as the PWEA program concludes, this set-aside program ends. The temporary nature of this remedy ensures that a race-conscious program will not last longer than the discriminatory effects it is designed to eliminate. It will be necessary for Congress to re-examine the need for a race-conscious remedy before it extends or re-enacts § 103 (f) (2).

The percentage chosen for the set-aside is within the scope of congressional discretion. The Courts of Appeals have approved temporary hiring remedies insuring that the percentage of minority group workers in a business or governmental agency will be reasonably related to the percentage of minority group members in the relevant population. *Boston Chapter NAACP* v. *Beecher,* 504 F. 2d, at 1027; *Bridgeport Guardians, Inc.* v. *Bridgeport,* 482 F. 2d, at 1341; *Carter* v. *Gallagher,* 452 F. 2d, at 331. Only 4% of contractors are members of minority groups, see *Fullilove* v. *Kreps,* 584 F. 2d 600, 608 (CA2 1978), although minority group members constitute about 17% of the national population, see *Constructors Association of Western Pennsylvania* v. *Kreps,* 441 F. Supp. 936, 951 (WD Pa. 1977), aff'd, 573 F. 2d 811 (CA3 1978). The choice of a 10% set-aside thus falls roughly halfway

---

Sen. Griffith); *id.,* at 40744 (remarks of Sen. Bayh). Senator Percy argued that the Plan was needed to redress discrimination against blacks in the construction industry. *Id.,* at 40742–40743. The day following the Senate vote to recede from its earlier position, Senator Kennedy noted "exceptionally blatant" racial discrimination in the construction trades. He commended the Senate's decision that "the Philadelphia Plan should be a useful and necessary tool for insuring equitable employment of minorities." *Id.,* at 41072.

between the present percentage of minority contractors and the percentage of minority group members in the Nation.

Although the set-aside is pegged at a reasonable figure, its effect might be unfair if it were applied rigidly in areas of the country where minority group members constitute a small percentage of the population. To meet this concern, Congress enacted a waiver provision into § 103 (f)(2). The factors governing issuance of a waiver include the availability of qualified minority contractors in a particular geographic area, the size of the locale's minority population, and the efforts made to find minority contractors. U. S. Dept. of Commerce, Local Public Works Program, Round II, Guidelines for 10% Minority Business Participation LPW Grants (1977); App. 165a–167a. We have been told that 1,261 waivers had been granted by September 9, 1979. Brief for Secretary of Commerce 62, n. 37.

## C

A race-conscious remedy should not be approved without consideration of an additional crucial factor—the effect of the set-aside upon innocent third parties. See *Teamsters* v. *United States,* 431 U. S., at 374–375. In this case, the petitioners contend with some force that they have been asked to bear the burden of the set-aside even though they are innocent of wrongdoing. I do not believe, however, that their burden is so great that the set-aside must be disapproved. As noted above, Congress knew that minority contractors were receiving only 1% of federal contracts at the time the set-aside was enacted. The PWEA appropriated $4 billion for public work projects, of which it could be expected that approximately $400 million would go to minority contractors. The Court of Appeals calculated that the set-aside would reserve about 0.25% of all the funds expended yearly on construction work in the United States for approximately 4% of the Nation's contractors who are members of a minority group. 584 F. 2d., at 607–608. The set-aside would have

no effect on the ability of the remaining 96% of contractors to compete for 99.75% of construction funds. In my view, the effect of the set-aside is limited and so widely dispersed that its use is consistent with fundamental fairness.[13]

Consideration of these factors persuades me that the set-aside is a reasonably necessary means of furthering the compelling governmental interest in redressing the discrimination that affects minority contractors. Any marginal unfairness to innocent nonminority contractors is not sufficiently significant—or sufficiently identifiable—to outweigh the governmental interest served by § 103 (f)(2). When Congress acts to remedy identified discrimination, it may exercise discretion in choosing a remedy that is reasonably necessary to accomplish its purpose. Whatever the exact breadth of that discretion, I believe that it encompasses the selection of the set-aside in this case.[14]

---

[13] Although I believe that the burden placed upon nonminority contractors is not unconstitutional, I reject the suggestion that it is legally irrelevant. Apparently on the theory that Congress could have enacted no set-aside and provided $400 million less in funding, the Secretary of Commerce argues that "[n]onminorities have lost no right or legitimate expectation by the addition of Section 103 (f)(2) to the 1976 Act." Brief for Secretary of Commerce 61. But the United States may not employ unconstitutional classifications, or base a decision upon unconstitutional considerations, when it provides a benefit to which a recipient is not legally entitled. Cf. *Califano* v. *Goldfarb*, 430 U. S. 199, 210–212 (1977) (opinion of BRENNAN, J.); *Richardson* v. *Belcher*, 404 U. S. 78, 81 (1971) ("To characterize an Act of Congress as conferring a 'public benefit' does not, of course, immunize it from scrutiny under the Fifth Amendment").

[14] Petitioners have suggested a variety of alternative programs that could be used in order to aid minority business enterprises in the construction industry. My view that this set-aside is within the discretion of Congress does not imply that other methods are unavailable to Congress. Nor do I conclude that use of a set-aside always will be an appropriate remedy or that the selection of a set-aside by any other governmental body would be constitutional. See *Bakke*, 438 U. S., at 309–310. The degree of specificity required in the findings of discrimination and the breadth of

## V

In the history of this Court and this country, few questions have been more divisive than those arising from governmental action taken on the basis of race. Indeed, our own decisions played no small part in the tragic legacy of government-sanctioned discrimination. See *Plessy* v. *Ferguson,* 163 U. S. 537 (1896); *Dred Scott* v. *Sandford,* 19 How. 393 (1857). At least since the decision in *Brown* v. *Board of Education,* 347 U. S. 483 (1954), the Court has been resolute in its dedication to the principle that the Constitution envisions a Nation where race is irrelevant. The time cannot come too soon when no governmental decision will be based upon immutable characteristics of pigmentation or origin. But in our quest to achieve a society free from racial classification, we cannot ignore the claims of those who still suffer from the effects of identifiable discrimination.

Distinguishing the rights of all citizens to be free from racial classifications from the rights of some citizens to be made whole is a perplexing, but necessary, judicial task. When we first confronted such an issue in *Bakke,* I concluded that the Regents of the University of California were not competent to make, and had not made, findings sufficient to uphold the use of the race-conscious remedy they adopted. As my opinion made clear, I believe that the use of racial classifications, which are fundamentally at odds with the ideals of a democratic society implicit in the Due Process and Equal Protection Clauses, cannot be imposed simply to serve transient social or political goals, however worthy they may be. But the issue here turns on the scope of congressional power, and Congress has been given a unique constitutional role in the enforcement of the post-Civil War Amendments. In this case, where Congress determined that minority contractors were victims of purposeful discrimination and where

discretion in the choice of remedies may vary with the nature and authority of a governmental body.

Congress chose a reasonably necessary means to effectuate its purpose, I find no constitutional reason to invalidate § 103 (f)(2).[15]

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE BLACKMUN join, concurring in the judgment.

My resolution of the constitutional issue in this case is governed by the separate opinion I coauthored in *University of California Regents* v. *Bakke*, 438 U. S. 265, 324–379 (1978). In my view, the 10% minority set-aside provision of the Public Works Employment Act of 1977 passes constitutional muster under the standard announced in that opinion.[1]

## I

In *Bakke*, I joined my Brothers BRENNAN, WHITE, and BLACKMUN in articulating the view that "racial classifications are not *per se* invalid under [the Equal Protection Clause of] the Fourteenth Amendment." *Id.*, at 356 (opinion concurring in judgment in part and dissenting in part) (hereinafter cited as joint separate opinion).[2] We acknowledged that "a

---

[15] Petitioners also contend that § 103 (f)(2) violates Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.* Because I believe that the set-aside is constitutional, I also conclude that the program does not violate Title VI. See *Bakke*, 438 U. S., at 287 (opinion of POWELL, J.); *id.*, at 348–350 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.).

[1] On the authority of *Bakke*, it is also clear to me that the set-aside provision does not violate Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.* In *Bakke* five Members of the Court were of the view that the prohibitions of Title VI—which outlaws racial discrimination in any program or activity receiving federal financial assistance—are coextensive with the equal protection guarantee of the Fourteenth Amendment. See 438 U. S., at 328 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.); *id.*, at 287 (opinion of POWELL, J.).

[2] In *Bakke*, the issue was whether a special minority admissions program of a state medical school violated the Equal Protection Clause of the Fourteenth Amendment. In the present case, the issue is whether the minority set-aside provision violates the equal protection component of

government practice or statute which . . . contains 'suspect classifications' is to be subjected to 'strict scrutiny' and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available." *Id.*, at 357. Thus, we reiterated the traditional view that racial classifications are prohibited if they are irrelevant. *Ibid.* In addition, we firmly adhered to "the cardinal principle that racial classifications that stigmatize—because they are drawn on the presumption that one race is inferior to another or because they put the weight of government behind racial hatred and separatism—are invalid without more." *Id.*, at 357–358.

We recognized, however, that these principles outlawing the irrelevant or pernicious use of race were inapposite to racial classifications that provide benefits to minorities for the purpose of remedying the present effects of past racial discrimination.[3] Such classifications may disadvantage some whites, but whites as a class lack the " 'traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.' " *Id.*, at 357 (quoting *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 28 (1973)). See also *United States* v. *Carolene Products Co.*, 304 U. S.

---

the Due Process Clause of the Fifth Amendment. As noted in *Bakke*, " '[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.' " *Id.*, at 367, n. 43 (joint separate opinion) (quoting *Buckley* v. *Valeo*, 424 U. S. 1, 93 (1976) (*per curiam*)).

[3] In *Bakke*, the Medical School of the University of California at Davis had adopted a special admissions program in which 16 out of the 100 places in each entering class were reserved for disadvantaged minorities. A major purpose of this program was to ameliorate the present effects of past racial discrimination. See 438 U. S., at 362 (joint separate opinion); *id.*, at 305–306 (opinion of POWELL, J.).

144, 152, n. 4 (1938). Because the consideration of race is relevant to remedying the continuing effects of past racial discrimination, and because governmental programs employing racial classifications for remedial purposes can be crafted to avoid stigmatization, we concluded that such programs should not be subjected to conventional "strict scrutiny"— scrutiny that is strict in theory, but fatal in fact. *Bakke, supra,* at 362 (joint separate opinion).

Nor did we determine that such programs should be analyzed under the minimally rigorous rational-basis standard of review. 438 U. S., at 358. We recognized that race has often been used to stigmatize politically powerless segments of society, and that efforts to ameliorate the effects of past discrimination could be based on paternalistic stereotyping, not on a careful consideration of modern social conditions. In addition, we acknowledged that governmental classification on the immutable characteristic of race runs counter to the deep national belief that state-sanctioned benefits and burdens should bear some relationship to individual merit and responsibility. *Id.,* at 360–361.

We concluded, therefore, that because a racial classification ostensibly designed for remedial purposes is susceptible to misuse, it may be justified only by showing "an important and articulated purpose for its use." *Id.,* at 361. "In addition, any statute must be stricken that stigmatizes any group or that singles out those least well represented in the political process to bear the brunt of a benign program." *Ibid.* In our view, then, the proper inquiry is whether racial classifications designed to further remedial purposes serve important governmental objectives and are substantially related to achievement of those objectives. *Id.,* at 359.

## II

Judged under this standard, the 10% minority set-aside provision at issue in this case is plainly constitutional. Indeed, the question is not even a close one.

As MR. CHIEF JUSTICE BURGER demonstrates, see *ante,* at 456–467, it is indisputable that Congress' articulated purpose for enacting the set-aside provision was to remedy the present effects of past racial discrimination. See also the concurring opinion of my Brother POWELL, *ante,* at 503–506. Congress had a sound basis for concluding that minority-owned construction enterprises, though capable, qualified, and ready and willing to work, have received a disproportionately small amount of public contracting business because of the continuing effects of past discrimination. Here, as in *Bakke,* 438 U. S., at 362 (joint separate opinion), "minority underrepresentation is substantial and chronic, and . . . the handicap of past discrimination is impeding access of minorities to" the benefits of the governmental program. In these circumstances remedying these present effects of past racial discrimination is a sufficiently important governmental interest to justify the use of racial classification. *Ibid.* See generally *id.,* at 362–373.[4]

Because the means chosen by Congress to implement the set-aside provision are substantially related to the achieve-

---

[4] Petitioners argue that the set-aside is invalid because Congress did not create a sufficient legislative record to support its conclusion that racial classifications were required to ameliorate the present effects of past racial discrimination. In petitioners' view, Congress must make particularized findings that past violations of the Equal Protection Clause and antidiscrimination statutes have a current effect on the construction industry.

This approach is fundamentally misguided. Unlike the courts, Congress is engaged in the broad mission of framing general social rules, not adjudicating individual disputes. Our prior decisions recognize Congress' authority to "require or authorize preferential treatment for those likely disadvantaged by societal racial discrimination. Such legislation has been sustained even without a requirement of findings of intentional racial discrimination by those required or authorized to accord preferential treatment, or a case-by-case determination that those to be benefited suffered from racial discrimination." *Bakke,* 438 U. S., at 366 (joint separate opinion).

See also *ante,* at 478; the concurring opinion of my Brother POWELL, *ante,* at 502–503.

ment of its remedial purpose, the provision also meets the second prong of our *Bakke* test. Congress reasonably determined that race-conscious means were necessary to break down the barriers confronting participation by minority enterprises in federally funded public works projects. That the set-aside creates a quota in favor of qualified and available minority business enterprises does not necessarily indicate that it stigmatizes. As our opinion stated in *Bakke,* "[f]or purposes of constitutional adjudication, there is no difference between" setting aside "a predetermined number of places for qualified minority applicants rather than using minority status as a positive factor to be considered in evaluating the applications of disadvantaged minority applicants." *Id.,* at 378. The set-aside, as enacted by Congress and implemented by the Secretary of Commerce, is carefully tailored to remedy racial discrimination while at the same time avoiding stigmatization and penalizing those least able to protect themselves in the political process. See *ante,* at 480–489. Cf. the concurring opinion of my Brother POWELL, *ante,* at 508–515. Since under the set-aside provision a contract may be awarded to a minority enterprise only if it is qualified to do the work, the provision stigmatizes as inferior neither a minority firm that benefits from it nor a nonminority firm that is burdened by it. Nor does the set-aside "establish a quota in the invidious sense of a ceiling," *Bakke, supra,* at 375 (joint separate opinion), on the number of minority firms that can be awarded public works contracts. In addition, the set-aside affects only a miniscule amount of the funds annually expended in the United States for construction work. See *ante,* at 484–485, n. 72.

In sum, it is clear to me that the racial classifications employed in the set-aside provision are substantially related to the achievement of the important and congressionally articulated goal of remedying the present effects of past racial discrimination. The provision, therefore, passes muster under the equal protection standard I adopted in *Bakke.*

### III

In my separate opinion in *Bakke,* 438 U. S., at 387–396, I recounted the "ingenious and pervasive forms of discrimination against the Negro" long condoned under the Constitution and concluded that "[t]he position of the Negro today in America is the tragic but inevitable consequence of centuries of unequal treatment." *Id.,* at 387, 395. I there stated:

> "It is because of a legacy of unequal treatment that we now must permit the institutions of this society to give consideration to race in making decisions about who will hold the positions of influence, affluence, and prestige in America. For far too long, the doors to those positions have been shut to Negroes. If we are ever to become a fully integrated society, one in which the color of a person's skin will not determine the opportunities available to him or her, we must be willing to take steps to open those doors." *Id.,* at 401–402.

Those doors cannot be fully opened without the acceptance of race-conscious remedies. As my Brother BLACKMUN observed in *Bakke:* "In order to get beyond racism, we must first take account of race. There is no other way." *Id.,* at 407 (separate opinion).

Congress recognized these realities when it enacted the minority set-aside provision at issue in this case. Today, by upholding this race-conscious remedy, the Court accords Congress the authority necessary to undertake the task of moving our society toward a state of meaningful equality of opportunity, not an abstract version of equality in which the effects of past discrimination would be forever frozen into our social fabric. I applaud this result. Accordingly, I concur in the judgment of the Court.

MR. JUSTICE STEWART, with whom MR. JUSTICE REHNQUIST joins, dissenting.

"Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. . . . The law regards man

as man, and takes no account of his surroundings or of his color. . . ." Those words were written by a Member of this Court 84 years ago. *Plessy* v. *Ferguson,* 163 U. S. 537, 559 (Harlan, J., dissenting). His colleagues disagreed with him, and held that a statute that required the separation of people on the basis of their race was constitutionally valid because it was a "reasonable" exercise of legislative power and had been "enacted in good faith for the promotion [of] the public good. . . ." *Id.,* at 550. Today, the Court upholds a statute that accords a preference to citizens who are "Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts," for much the same reasons. I think today's decision is wrong for the same reason that *Plessy* v. *Ferguson* was wrong, and I respectfully dissent.

### A

The equal protection standard of the Constitution has one clear and central meaning—it absolutely prohibits invidious discrimination by government. That standard must be met by every State under the Equal Protection Clause of the Fourteenth Amendment. *Loving* v. *Virginia,* 388 U. S. 1, 10; *Hill* v. *Texas,* 316 U. S. 400; *Strauder* v. *West Virginia,* 100 U. S. 303, 307–308; *Slaughter-House Cases,* 16 Wall. 36, 71–72. And that standard must be met by the United States itself under the Due Process Clause of the Fifth Amendment. *Washington* v. *Davis,* 426 U. S. 229, 239; *Bolling* v. *Sharpe,* 347 U. S. 497.[1] Under our Constitution, any official action that treats a person differently on account of his race or ethnic origin is inherently suspect and presumptively invalid. *Mc-Laughlin* v. *Florida,* 379 U. S. 184, 192; *Bolling* v. *Sharpe, supra,* at 499; *Korematsu* v. *United States,* 323 U. S. 214, 216.[2]

---

[1] "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley* v. *Valeo,* 424 U. S. 1, 93.

[2] By contrast, nothing in the Constitution prohibits a private person from discriminating on the basis of race in his personal or business affairs. See *Steelworkers* v. *Weber,* 443 U. S. 193. The Fourteenth Amendment

The hostility of the Constitution to racial classifications by government has been manifested in many cases decided by this Court. See, e. g., Loving v. Virginia, supra; McLaughlin v. Florida, supra; Brown v. Board of Education, 347 U. S. 483; Missouri ex rel. Gaines v. Canada, 305 U. S. 337. And our cases have made clear that the Constitution is wholly neutral in forbidding such racial discrimination, whatever the race may be of those who are its victims. In Anderson v. Martin, 375 U. S. 399, for instance, the Court dealt with a state law that required that the race of each candidate for election to public office be designated on the nomination papers and ballots. Although the law applied equally to candidates of whatever race, the Court held that it nonetheless violated the constitutional standard of equal protection. "We see no relevance," the Court said, "in the State's pointing up the race of the candidate as bearing upon his qualifications for office." Id., at 403 (emphasis added). Similarly, in Loving v. Virginia, supra, and McLaughlin v. Florida, supra, the Court held that statutes outlawing miscegenation and interracial cohabitation were constitutionally invalid, even though the laws penalized all violators equally. The laws were unconstitutional for the simple reason that they penalized individuals solely because of their race, whatever their race might be. See also Goss v. Board of Education, 373 U. S. 683; Buchanan v. Warley, 245 U. S. 60.[3]

---

limits only the actions of the States; the Fifth Amendment limits only the actions of the National Government.

[3] University of California Regents v. Bakke, 438 U. S. 265, and United Jewish Organizations v. Carey, 430 U. S. 144, do not suggest a different rule. The Court in Bakke invalidated the racially preferential admissions program that had deprived Bakke of equal access to a place in the medical school of a state university. In United Jewish Organizations v. Carey, a state legislature had apportioned certain voting districts with an awareness of their racial composition. Since the plaintiffs there had "failed to show that the legislative reapportionment plan had either the purpose or the effect of discriminating against them on the basis of their race," no

This history contains one clear lesson. Under our Constitution, the government may never act to the detriment of a person solely because of that person's race.[4] The color of a person's skin and the country of his origin are immutable facts that bear no relation to ability, disadvantage, moral culpability, or any other characteristics of constitutionally permissible interest to government. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi* v. *United States,* 320 U. S. 81, 100, quoted in *Loving* v. *Virginia, supra,* at 11.[5]

---

constitutional violation had occurred. 430 U. S., at 179–180 (concurring opinion). No person in that case was deprived of his electoral franchise.

More than 35 years ago, during the Second World War, this Court did find constitutional a governmental program imposing injury on the basis of race. See *Korematsu* v. *United States,* 323 U. S. 214; *Hirabayashi* v. *United States,* 320 U. S. 81. Significantly, those cases were decided not only in time of war, but also in an era before the Court had held that the Due Process Clause of the Fifth Amendment imposes the same equal protection standard upon the Federal Government that the Fourteenth Amendment imposes upon the States. See *Bolling* v. *Sharpe,* 347 U. S. 497.

[4] A court of equity may, of course, take race into account in devising a remedial decree to undo a violation of a law prohibiting discrimination on the basis of race. See *Teamsters* v. *United States,* 431 U. S. 324; *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747; *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 18–32. But such a judicial decree, following litigation in which a violation of law has been determined, is wholly different from generalized legislation that awards benefits and imposes detriments dependent upon the race of the recipients. See text in Part B, *infra.*

[5] As Mr. Justice Murphy wrote in dissenting from the Court's opinion and judgment in *Korematsu* v. *United States, supra,* at 242:

"Racial discrimination in any form and in any degree has no justifiable part whatever in our democratic way of life. It is unattractive in any setting but it is utterly revolting among a free people who have embraced the principles set forth in the Constitution of the United States."

See also *DeFunis* v. *Odegaard,* 416 U. S. 312, 331–344 (Douglas, J., dissenting); A. Bickel, The Morality of Consent 132–133 (1975).

In short, racial discrimination is by definition invidious discrimination.

The rule cannot be any different when the persons injured by a racially biased law are not members of a racial minority. The guarantee of equal protection is "universal in [its] application, to all persons . . . without regard to any differences of race, of color, or of nationality." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369. See *In re Griffiths,* 413 U. S. 717; *Hernandez* v. *Texas,* 347 U. S. 475; *Truax* v. *Raich,* 239 U. S. 33, 39–43; *Strauder* v. *West Virginia,* 100 U. S., at 308. The command of the equal protection guarantee is simple but unequivocal: In the words of the Fourteenth Amendment: "No State shall . . . deny to *any* person . . . the equal protection of the laws." Nothing in this language singles out some "persons" for more "equal" treatment than others. Rather, as the Court made clear in *Shelley* v. *Kraemer,* 334 U. S. 1, 22, the benefits afforded by the Equal Protection Clause "are, by its terms, guaranteed to the individual. [They] are personal rights." From the perspective of a person detrimentally affected by a racially discriminatory law, the arbitrariness and unfairness is entirely the same, whatever his skin color and whatever the law's purpose, be it purportedly "for the promotion of the public good" or otherwise.

No one disputes the self-evident proposition that Congress has broad discretion under its spending power to disburse the revenues of the United States as it deems best and to set conditions on the receipt of the funds disbursed. No one disputes that Congress has the authority under the Commerce Clause to regulate contracting practices on federally funded public works projects, or that it enjoys broad powers under § 5 of the Fourteenth Amendment "to enforce by appropriate legislation" the provisions of that Amendment. But these self-evident truisms do not begin to answer the question before us in this case. For in the exercise of its powers, Congress must obey the Constitution just as the legislatures of all the States must obey the Constitution in the exercise of their

powers. If a law is unconstitutional, it is no less unconstitutional just because it is a product of the Congress of the United States.

## B

On its face, the minority business enterprise (MBE) provision at issue in this case denies the equal protection of the law. The Public Works Employment Act of 1977 directs that all project construction shall be performed by those private contractors who submit the lowest competitive bids and who meet established criteria of responsibility. 42 U. S. C. § 6705 (e) (1) (1976 ed., Supp. II). One class of contracting firms— defined solely according to the racial and ethnic attributes of their owners—is, however, excepted from the full rigor of these requirements with respect to a percentage of each federal grant. The statute, on its face and in effect, thus bars a class to which the petitioners belong from having the opportunity to receive a government benefit, and bars the members of that class solely on the basis of their race or ethnic background. This is precisely the kind of law that the guarantee of equal protection forbids.

The Court's attempt to characterize the law as a proper remedial measure to counteract the effects of past or present racial discrimination is remarkably unconvincing. The Legislative Branch of government is not a court of equity. It has neither the dispassionate objectivity nor the flexibility that are needed to mold a race-conscious remedy around the single objective of eliminating the effects of past or present discrimination.[6]

But even assuming that Congress has the power, under § 5 of the Fourteenth Amendment or some other constitutional pro-

---

[6] See n. 4, supra. In McDaniel v. Barresi, 402 U. S. 39, the Court approved a county's voluntary race-conscious redrafting of its public school pupil assignment system in order to eliminate the effects of past unconstitutional racial segregation of the pupils. But no pupil was deprived of a public school education as a result.

vision, to remedy previous illegal racial discrimination, there is no evidence that Congress has in the past engaged in racial discrimination in its disbursement of federal contracting funds. The MBE provision thus pushes the limits of any such justification far beyond the equal protection standard of the Constitution. Certainly, nothing in the Constitution gives Congress any greater authority to impose detriments on the basis of race than is afforded the Judicial Branch.[7] And a judicial decree that imposes burdens on the basis of race can be upheld only where its sole purpose is to eradicate the actual effects of illegal race discrimination. See *Pasadena City Board of Education* v. *Spangler,* 427 U. S. 424.

The provision at issue here does not satisfy this condition. Its legislative history suggests that it had at least two other objectives in addition to that of counteracting the effects of past or present racial discrimination in the public works construction industry.[8] One such purpose appears to have been to as-

---

[7] Section 2 of the Thirteenth Amendment gives Congress the authority to "enforce" the provisions of § 1 of the same Amendment, and § 5 of the Fourteenth Amendment provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article." Neither section grants to Congress the authority to require the States to flout their obligation under § 1 of the Fourteenth Amendment to afford "the equal protection of the laws" or the power to enact legislation that itself violates the equal protection component of the Fifth Amendment.

[8] The legislative history of the MBE provision itself contains not one mention of racial discrimination or the need to provide a mechanism to correct the effects of such discrimination. From the context of the Act, however, it is reasonable to infer that the program was enacted, at least in part, to remedy perceived past and present racial discrimination. In 1977, Congress knew that many minority business enterprises had historically suffered racial discrimination in the economy as a whole and in the construction industry in particular. See H. R. Rep. No. 94–1791, pp. 182–183 (1977); H. R. Rep. No. 94–468, pp. 1–2 (1975); To Amend and Extend the Local Public Works Capital Development and Investment Act: Hearings on H. R. 11 and Related Bills before the Subcommittee on Economic Development of the House Committee on Public Works and

sure to minority contractors a certain percentage of federally funded public works contracts.[9]  But, since the guarantee of equal protection immunizes from capricious governmental treatment "persons"—not "races"—it can never countenance laws that seek racial balance as a goal in and of itself.  "Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake.  This the Constitution forbids." *University of California Regents* v. *Bakke,* 438 U. S. 265, 307 (opinion of POWELL, J.).  Second, there are indications that the MBE provision may have been enacted to compensate for the effects of social, educational, and economic "disadvantage."[10]  No race, however, has a monopoly on social, educational, or eco-

---

Transportation, 95th Cong., 1st Sess., 939 (1977) (statement of Rep. Conyers).  Some of this discrimination may well, in fact, have violated one or more of the state and federal antidiscrimination laws.

[9] See 123 Cong. Rec. 5327 (1977) (Rep. Mitchell) ("all [the MBE provision] attempts to do is to provide that those who are in minority businesses get a *fair share of the action* from this public works legislation") (emphasis supplied).  Moreover, sponsors of the legislation repeatedly referred to the low participation rate of minority businesses in federal procurement programs.  See *id.,* at 5331 (Rep. Biaggi); *id.,* at 5327–5328 (Rep. Mitchell); *id.,* at 5097–5098 (Rep. Mitchell); *id.,* at 7156 (Sen. Brooke).

[10] See *id.,* at 5330 (Rep. Conyers) ("minority contractors and businessmen who are trying to enter in on the bidding process . . . get the 'works' almost every time.  The bidding process is one whose intricacies defy the imaginations of most of us here").  That the elimination of "disadvantage" is one of the program's objectives is an inference that finds support in the agency's own interpretation of the statute.  See U. S. Dept. of Commerce, Economic Development Administration, EDA Minority Business Enterprise Technical Bulletin (Additional Assistance and Information Available to Grantees and Their Contractors In Meeting The 10% MBE Requirement) 9–10 (1977) (Technical Bulletin) ("a [minority] subcontractor's price should not be considered unreasonable if he is merely trying to cover his costs because the price results from *disadvantage* which affects the MBE's costs of doing business *or* results from *discrimination"* (emphasis added)).

nomic disadvantage,[11] and any law that indulges in such a presumption clearly violates the constitutional guarantee of equal protection. Since the MBE provision was in whole or in part designed to effectuate objectives other than the elimination of the effects of racial discrimination, it cannot stand as a remedy that comports with the strictures of equal protection, even if it otherwise could.[12]

---

[11] For instance, in 1978, 83.4% of persons over the age of 25 who had not completed high school were "white," see U. S. Dept. of Commerce Bureau of the Census, Statistical Abstract of the United States 145 (1979), and in 1977, 79.0% of households with annual incomes of less than $5,000 were "white," see id., at 458.

[12] Moreover, even a properly based judicial decree will be struck down if the scope of the remedy it provides is not carefully tailored to fit the nature and extent of the violation. See Dayton Board of Education v. Brinkman, 433 U. S. 406, 419–420; Milliken v. Bradley, 418 U. S. 717. Here, assuming that the MBE provision was intended solely as a remedy for past and present racial discrimination, it sweeps far too broadly. It directs every state and local government covered by the program to set aside 10% of its grant for minority business enterprises. Waivers from that requirement are permitted, but only where insufficient numbers of minority businesses capable of doing the work at nonexorbitant prices are located in the relevant contracting area. No waiver is provided for any governmental entity that can prove a history free of racial discrimination. Nor is any exemption permitted for nonminority contractors that are able to demonstrate that they have not engaged in racially discriminatory behavior. Finally, the statute makes no attempt to direct the aid it provides solely toward those minority contracting firms that arguably still suffer from the effects of past or present discrimination.

These are not the characteristics of a racially conscious remedial decree that is closely tailored to the evil to be corrected. In today's society, it constitutes far too gross an oversimplification to assume that every single Negro, Spanish-speaking citizen, Oriental, Indian, Eskimo, and Aleut potentially interested in construction contracting currently suffers from the effects of past or present racial discrimination. Since the MBE set-aside must be viewed as resting upon such an assumption, it necessarily paints with too broad a brush. Except to make whole the identified victims of racial discrimination, the guarantee of equal protection prohibits the government from taking detrimental action against innocent people on the basis of the sins of others of their own race.

## C

The Fourteenth Amendment was adopted to ensure that every person must be treated equally by each State regardless of the color of his skin. The Amendment promised to carry to its necessary conclusion a fundamental principle upon which this Nation had been founded—that the law would honor no preference based on lineage.[13] Tragically, the promise of 1868 was not immediately fulfilled, and decades passed before the States and the Federal Government were finally directed to eliminate detrimental classifications based on race. Today, the Court derails this achievement and places its imprimatur on the creation once again by government of privileges based on birth.

The Court, moreover, takes this drastic step without, in my opinion, seriously considering the ramifications of its decision. Laws that operate on the basis of race require definitions of race. Because of the Court's decision today, our statute books will once again have to contain laws that reflect the odious practice of delineating the qualities that make one person a Negro and make another white.[14] Moreover, racial discrimination, even "good faith" racial discrimination, is inevitably a two-edged sword. "[P]referential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relationship to individual worth." *University of California Regents* v. *Bakke, supra,* at 298 (opin-

---

[13] The Framers of our Constitution lived at a time when the Old World still operated in the shadow of ancient feudal traditions. As products of the Age of Enlightenment, they set out to establish a society that recognized no distinctions among white men on account of their birth. See U. S. Const., Art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States"). The words Thomas Jefferson wrote in 1776 in the Declaration of Independence, however, contained the seeds of a far broader principle: "We hold these truths to be self-evident: that all men are created equal. . . ."

[14] See Technical Bulletin, *supra,* n. 10, at 1. Cf. Ga. Code § 53–312 (1937); Tex. Penal Code, Art. 493 (Vernon 1938).

ion of POWELL, J.). Most importantly, by making race a relevant criterion once again in its own affairs the Government implicitly teaches the public that the apportionment of rewards and penalties can legitimately be made according to race—rather than according to merit or ability—and that people can, and perhaps should, view themselves and others in terms of their racial characteristics. Notions of "racial entitlement" will be fostered, and private discrimination will necessarily be encouraged.[15] See *Hughes* v. *Superior Court,* 339 U. S. 460, 463–464; T. Eastland & W. Bennett, Counting by Race 139–170 (1979); Van Alstyne, Rites of Passage: Race, the Supreme Court, and the Constitution, 46 U. Chi. L. Rev. 775 (1979).

There are those who think that we need a new Constitution, and their views may someday prevail. But under the Constitution we have, one practice in which government may never engage is the practice of racism—not even "temporarily" and not even as an "experiment."

For these reasons, I would reverse the judgment of the Court of Appeals.

MR. JUSTICE STEVENS, dissenting.

The 10% set-aside contained in the Public Works Employment Act of 1977 (Act), 91 Stat. 116, creates monopoly privileges in a $400 million market for a class of investors defined solely by racial characteristics. The direct beneficiaries of these monopoly privileges are the relatively small number of persons within the racial classification who represent the entrepreneurial subclass—those who have, or can borrow, working capital.

History teaches us that the costs associated with a sovereign's grant of exclusive privileges often encompass more

---

[15] "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead* v. *United States,* 277 U. S. 438, 485 (Brandeis, J., dissenting).

than the high prices and shoddy workmanship that are familiar handmaidens of monopoly; they engender animosity and discontent as well. The economic consequences of using noble birth as a basis for classification in 18th-century France, though disastrous, were nothing as compared with the terror that was engendered in the name of "égalité" and "fraternité." Grants of privilege on the basis of characteristics acquired at birth are far from an unmixed blessing.

Our historic aversion to titles of nobility[1] is only one aspect of our commitment to the proposition that the sovereign has a fundamental duty to govern impartially.[2] When government accords different treatment to different persons, there must be a reason for the difference.[3] Because racial

---

[1] "Such pure discrimination is most certainly not a 'legitimate purpose' for our Federal Government, which should be especially sensitive to discrimination on grounds of birth. 'Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.' *Hirabayashi* v. *United States*, 320 U. S. 81, 100. From its inception, the Federal Government has been directed to treat all its citizens as having been 'created equal' in the eyes of the law. The Declaration of Independence states:

"'We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.'

"And the rationale behind the prohibition against the grant of any title of nobility by the United States, see U. S. Const., Art. I, § 9, cl. 8, equally would prohibit the United States from attaching any badge of ignobility to a citizen at birth." *Mathews* v. *Lucas*, 427 U. S. 495, 520–521, n. 3 (STEVENS, J., dissenting).

[2] "The federal sovereign, like the States, must govern impartially. The concept of equal justice under law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment." *Hampton* v. *Mow Sun Wong*, 426 U. S. 88, 100.

See also *Harris* v. *McRae, ante,* at 349, 356–357 (STEVENS, J., dissenting); *Craig* v. *Boren,* 429 U. S. 190, 211 (STEVENS, J., concurring).

[3] "As a matter of principle and in view of my attitude toward the equal

characteristics so seldom provide a relevant basis for disparate treatment,[4] and because classifications based on race are potentially so harmful to the entire body politic,[5] it is espe-

protection clause, I do not think differences of treatment under law should be approved on classification because of differences unrelated to the legislative purposes. The equal protection clause ceases to assure either equality or protection if it is avoided by any conceivable difference that can be pointed out between those bound and those left free. This Court has often announced the principle that the differentiation must have an appropriate relation to the object of the legislation or ordinance." *Railway Express Agency, Inc.* v. *New York,* 336 U. S. 106, 115 (Jackson, J., concurring).

[4] "Habit, rather than analysis, makes it seem acceptable and natural to distinguish between male and female, alien and citizens, legitimate and illegitimate; for too much of our history there was the same inertia in distinguishing between black and white. But that sort of stereotyped reaction may have no rational relationship—other than pure prejudicial discrimination—to the stated purpose for which the classification is being made." *Mathews* v. *Lucas, supra,* at 520–521 (STEVENS, J., dissenting) (footnote omitted).

[5] Indeed, the very attempt to define with precision a beneficiary's qualifying racial characteristics is repugnant to our constitutional ideals. The so-called guidelines developed by the Economic Development Administration, see the appendix to the opinion of THE CHIEF JUSTICE, ¶ 3, *ante,* at 494–495, are so general as to be fairly innocuous; as a consequence they are too vague to be useful. For example, it is unclear whether the firm described in n. 16, *infra,* would be eligible for the 10% set-aside. If the National Government is to make a serious effort to define racial classes by criteria that can be administered objectively, it must study precedents such as the First Regulation to the Reichs Citizenship Law of November 14, 1935, translated in 4 Nazi Conspiracy and Aggression, Document No. 1417–PS, pp. 8–9 (1946):

"On the basis of Article 3, Reichs Citizenship Law, of 15 Sept. 1935 (RGB1. I, page 146) the following is ordered:

"Article 5

"1. A Jew is anyone who descended from at least three grandparents who were racially full Jews. Article 2, par. 2, second sentence will apply.

"2. A Jew is also one who descended from two full Jewish parents, if: (a) he belonged to the Jewish religious community at the time this law

cially important that the reasons for any such classification be clearly identified and unquestionably legitimate.

The statutory definition of the preferred class includes "citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts." All aliens and all nonmembers of the racial class are excluded. No economic, social, geographical, or historical criteria are relevant for exclusion or inclusion. There is not one word in the remainder of the Act or in the legislative history that explains why any Congressman or Senator favored this particular definition over any other or that identifies the common characteristics that every member of the preferred class was believed to share.[6] Nor does the Act or its history ex-

---

was issued, or who joined the community later; (b) he was married to a Jewish person, at the time the law was issued, or married one subsequently; (c) he is the offspring from a marriage with a Jew, in the sense of Section 1, which was contracted after the Law for the protection of German blood and German honor became effective (RGB1. I, page 1146 of 15 Sept. 1935); (d) he is the offspring of an extramarital relationship, with a Jew, according to Section 1, and will be born out of wedlock after July 31, 1936."

[6] In 1968, almost 10 years before the Act was passed, the Small Business Administration had developed a program to assist small business concerns owned or controlled by "socially or economically disadvantaged persons." The agency's description of persons eligible for such assistance stated that such "persons include, but are not limited to, black Americans, American Indians, Spanish-Americans, oriental Americans, Eskimos and Aleuts. . . ." See opinion of THE CHIEF JUSTICE, ante, at 463–464. This may be the source of the definition of the class at issue in this case. See also ante, at 487–488, n. 73. But the SBA's class of socially or economically disadvantaged persons neither included all persons in the racial class nor excluded all nonmembers of the racial class. Race was used as no more than a factor in identifying the class of the disadvantaged. The difference between the statutory quota involved in this case and the SBA's 1968 description of those whose businesses were to be assisted under § 8 (a) of the Small Business Act is thus at least as great as the difference between the University of California's racial quota and the Harvard ad-

plain why 10% of the total appropriation was the proper amount to set aside for investors in each of the six racial subclasses.[7]

Four different, though somewhat interrelated, justifications for the racial classification in this Act have been advanced: first, that the 10% set-aside is a form of reparation for past injuries to the entire membership of the class; second, that it is an appropriate remedy for past discrimination against minority business enterprises that have been denied access to public contracts; third, that the members of the favored class have a special entitlement to "a piece of the action" when government is distributing benefits; and, fourth, that the program is an appropriate method of fostering greater minority participation in a competitive economy. Each of these asserted justifications merits separate scrutiny.

---

missions system that MR. JUSTICE POWELL regarded as critical in *University of California Regents* v. *Bakke*, 438 U. S. 265, 315–318.

[7] It was noted that the value of the federal contracts awarded to minority business firms in prior years had amounted to less than 1% of the total; since the statutory set-aside of 10% may be satisfied by subcontracts to minority business enterprises, it is possible that compliance with the statute would not change the 1% figure.

The legislative history also revealed that minority business enterprises represented about 3 or 4% of all eligible firms; the history does not indicate, however, whether the 10% figure was intended to provide the existing firms with three times as much business as they could expect to receive on a random basis or to encourage members of the class to acquire or form new firms. An Economic Development Administration guideline arguably implies that new investments made in order to take advantage of the 10% set-aside would not be considered "bona fide." See appendix to the opinion of THE CHIEF JUSTICE, *ante*, at 492.

The 10% figure bears no special relationship to the relative size of the entire racial class, to any of the six subclasses, or to the population of the subclasses in the areas where they primarily reside. The Aleuts and the Eskimos, for example, respectively represent less than 1% and 7% of the population of Alaska, see The New Columbia Encyclopedia 47, 59, 891 (4th ed. 1975), while Spanish-speaking or Negro citizens represent a majority or almost a majority in a large number of urban areas.

## I

Racial characteristics may serve to define a group of persons who have suffered a special wrong and who, therefore, are entitled to special reparations. Congress has recognized, for example, that the United States has treated some Indian tribes unjustly and has created procedures for allowing members of the injured classes to obtain classwide relief. See, e. g., *Delaware Tribal Business Committee* v. *Weeks,* 430 U. S. 73. But as I have formerly suggested, if Congress is to authorize a recovery for a class of similarly situated victims of a past wrong, it has an obligation to distribute that recovery among the members of the injured class in an evenhanded way. See *id.,* at 97–98 (STEVENS, J., dissenting). Moreover, in such a case the amount of the award should bear some rational relationship to the extent of the harm it is intended to cure.

In his eloquent separate opinion in *University of California Regents* v. *Bakke,* 438 U. S. 265, 387, MR. JUSTICE MARSHALL recounted the tragic class-based discrimination against Negroes that is an indelible part of America's history. I assume that the wrong committed against the Negro class is both so serious and so pervasive that it would constitutionally justify an appropriate classwide recovery measured by a sum certain for every member of the injured class. Whether our resources are adequate to support a fair remedy of that character is a policy question I have neither the authority nor the wisdom to address. But that serious classwide wrong cannot in itself justify the particular classification Congress has made in this Act. Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification. Quite obviously, the history of discrimination against black citizens in America cannot justify a grant of privileges to Eskimos or Indians.

Even if we assume that each of the six racial subclasses has suffered its own special injury at some time in our his-

tory, surely it does not necessarily follow that each of those subclasses suffered harm of identical magnitude. Although "the Negro was dragged to this country in chains to be sold in slavery," *Bakke, supra,* at 387 (opinion of MARSHALL, J.), the "Spanish-speaking" subclass came voluntarily, frequently without invitation, and the Indians, the Eskimos and the Aleuts had an opportunity to exploit America's resources before the ancestors of most American citizens arrived. There is no reason to assume, and nothing in the legislative history suggests, much less demonstrates, that each of the subclasses is equally entitled to reparations from the United States Government.[8]

At best, the statutory preference is a somewhat perverse form of reparation for the members of the injured classes. For those who are the most disadvantaged within each class are the least likely to receive any benefit from the special privilege even though they are the persons most likely still to be suffering the consequences of the past wrong.[9] A ran-

---

[8] Ironically, the Aleuts appear to have been ruthlessly exploited at some point in their history by Russian fur traders. See The New Columbia Encyclopedia, *supra,* at 59.

[9] For a similar reason, the discrimination against males condemned in *Califano* v. *Goldfarb,* 430 U. S. 199, could not be justified as a remedy for past discrimination against females. That case involved a statutory provision which relieved widows from the obligation of proving dependency on their deceased spouses in order to obtain benefits, but did not similarly relieve widowers.

"The widows who benefit from the disparate treatment are those who were sufficiently successful in the job market to become nondependent on their husbands. Such a widow is the least likely to need special benefits. The widow most in need is the one who is 'suddenly forced into a job market with which she is unfamiliar, and in which, because of her former economic dependency, she will have fewer skills to offer.' [*Kahn* v. *Shevin,* 416 U. S. 351,] 354. To accept the *Kahn* justification we must presume that Congress deliberately gave a special benefit to those females least likely to have been victims of the historic discrimination discussed in *Kahn.*" *Id.,* at 221 (STEVENS, J., concurring in judgment).

dom distribution to a favored few is a poor form of compensation for an injury shared by many.

My principal objection to the reparation justification for this legislation, however, cuts more deeply than my concern about its inequitable character. We can never either erase or ignore the history that MR. JUSTICE MARSHALL has recounted. But if that history can justify such a random distribution of benefits on racial lines as that embodied in this statutory scheme, it will serve not merely as a basis for remedial legislation, but rather as a permanent source of justification for grants of special privileges. For if there is no duty to attempt either to measure the recovery by the wrong or to distribute that recovery within the injured class in an evenhanded way, our history will adequately support a legislative preference for almost any ethnic, religious, or racial group with the political strength to negotiate "a piece of the action" for its members.

Although I do not dispute the validity of the assumption that each of the subclasses identified in the Act has suffered a severe wrong at some time in the past, I cannot accept this slapdash statute as a legitimate method of providing class-wide relief.

## II

The Act may also be viewed as a much narrower remedial measure—one designed to grant relief to the specific minority business enterprises that have been denied access to public contracts by discriminatory practices.

The legislative history of the Act does not tell us when, or how often, any minority business enterprise was denied such access. Nevertheless, it is reasonable to infer that the number of such incidents has been relatively small in recent years. For, as noted by the Solicitor General, in the last 20 years Congress has enacted numerous statutes designed to eliminate discrimination and its effects from federally funded

programs.[10]   Title VI of the Civil Rights Act of 1964 unequivocally and comprehensively prohibits discrimination on the basis of race in any program or activity receiving federal financial assistance.   In view of the scarcity of litigated claims on behalf of minority business enterprises during this period, and the lack of any contrary evidence in the legislative record, it is appropriate to presume that the law has generally been obeyed.

Assuming, however, that some firms have been denied public business for racial reasons, the instant statutory remedy is nevertheless demonstrably much broader than is necessary to right any such past wrong.   For the statute grants the special preference to a class that includes (1) those minority-owned firms that have successfully obtained business in the past on a free competitive basis and undoubtedly are capable of doing so in the future as well; (2) firms that have never attempted to obtain any public business in the past; (3) firms that were initially formed after the Act was passed, including those that may have been organized simply to take advantage of its provisions; [11] (4) firms that have tried to obtain public business but were unsuccessful for reasons that are unrelated to the racial characteristics of their stockholders;

---

[10] "The statute with the most comprehensive coverage is Title VI of the Civil Rights Act of 1964, 42 U. S. C. 2000d *et seq.*, which broadly prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance.   Since the passage of Title VI, many other specific federal grant statutes have contained similar prohibitions against discrimination in particular funded activities.   See, *e. g.*, State and Local Fiscal Assistance Amendments of 1976, 31 U. S. C. 1242; Energy Conservation and Production Act, 42 U. S. C. 6870; Housing and Community Development Act of 1974, 42 U. S. C. 5309; Comprehensive Employment and Training Act of 1973, 29 U. S. C. 991."   Brief for Secretary of Commerce 21, n. 7.

[11] Although the plain language of the statute appears to include such firms, as I have already noted, n. 7, *supra*, the EDA guidelines may consider such newly formed firms ineligible for the statutory set-aside.

and (5) those firms that have been victimized by racial discrimination.

Since there is no reason to believe that any of the firms in the first four categories had been wrongfully excluded from the market for public contracts, the statutory preference for those firms cannot be justified as a remedial measure. And since a judicial remedy was already available for the firms in the fifth category,[12] it seems inappropriate to regard the preference as a remedy designed to redress any specific wrongs.[13] In any event, since it is highly unlikely that the composition of the fifth category is at all representative of the entire class of firms to which the statute grants a valuable preference, it is ill-fitting to characterize this as a "narrowly tailored" remedial measure.[14]

## III

The legislative history of the Act discloses that there is a group of legislators in Congress identified as the "Black Caucus" and that members of that group argued that if the Federal Government was going to provide $4 billion of new

---

[12] See *University of California Regents* v. *Bakke*, 438 U. S., at 418–421 (opinion of STEVENS, J.). See also § 207 (d) of the Public Works Employment Act of 1976, 90 Stat. 1008, 42 U. S. C. § 6727 (d).

[13] I recognize that the EDA has issued a Technical Bulletin, relied on heavily by THE CHIEF JUSTICE, *ante*, at 469–472, which distinguishes between higher bids quoted by minority subcontractors which are attributable to the effects of disadvantage or discrimination and those which are not. That is, according to the Bulletin, if it is determined that a subcontractor's uncompetitive high price is not attributable to the effects of discrimination, a contractor may be entitled to relief from the 10% set-aside requirement. But even assuming that the Technical Bulletin accurately reflects Congress' intent in enacting the set-aside, it is not easy to envision how one could realistically demonstrate with any degree of precision, if at all, the extent to which a bid has been inflated by the effects of disadvantage or past discrimination. Consequently, while THE CHIEF JUSTICE describes the set-aside as a remedial measure, it plainly operates as a flat quota.

[14] See THE CHIEF JUSTICE's opinion, *ante*, at 480.

public contract business, their constituents were entitled to "a piece of the action."

It is neither unusual nor reprehensible for Congressmen to promote the authorization of public construction in their districts. The flow of capital and employment into a district inevitably has both direct and indirect consequences that are beneficial. As MR. JUSTICE BRENNAN noted in *Elrod* v. *Burns*, 427 U. S. 347, however, the award of such contracts may become a form of political patronage that is dispensed by the party in power.[15] Although the practice of awarding such contracts to political allies may be as much a part of our history as the employment practices condemned in *Elrod*, it would surely be unconstitutional for the legislature to specify that all, or a certain portion, of the contracts authorized by a specific statute must be given to businesses controlled by members of one political party or another. That would be true even if the legislative majority was convinced that a grossly disproportionate share had been awarded to members of the opposite party in previous years.

In the short run our political processes might benefit from legislation that enhanced the ability of representatives of minority groups to disseminate patronage to their political backers. But in the long run any rule that authorized the award of public business on a racial basis would be just as objectionable as one that awarded such business on a purely partisan basis.

The legislators' interest in providing their constituents with favored access to benefits distributed by the Federal Government is, in my opinion, a plainly impermissible justification for this racial classification.

## IV

The interest in facilitating and encouraging the participa-

---

[15] "Nonofficeholders may be the beneficiaries of lucrative government contracts for highway construction, buildings, and supplies." 427 U. S., at 353.

tion by minority business enterprises in the economy is unquestionably legitimate. Any barrier to such entry and growth—whether grounded in the law or in irrational prejudice—should be vigorously and thoroughly removed. Equality of economic and investment opportunity is a goal of no less importance than equality of employment opportunity. This statute, however, is not designed to remove any barriers to entry. Nor does its sparse legislative history detail any insuperable or even significant obstacles to entry into the competitive market.

Three difficulties encountered by minority business enterprises in seeking governmental business on a competitive basis are identified in the legislative history. There were references to (1) unfamiliarity with bidding procedures followed by procurement officers, (2) difficulties in obtaining financing, and (3) past discrimination in the construction industry.

The first concern is no doubt a real problem for all businesses seeking access to the public contract market for the first time. It justifies a thorough review of bidding practices to make sure that they are intelligible and accessible to all. It by no means justifies an assumption that minority business enterprises are any less able to prepare and submit bids in proper form than are any other businessmen. Consequently, that concern does not justify a statutory classification on racial grounds.

The second concern would justify legislation prohibiting private discrimination in lending practices or authorizing special public financing for firms that have been or are unable to borrow money for reasons unrelated to their credit rating. It would not be an adequate justification for a requirement that a fixed percentage of all loans made by national banks be made to Eskimos or Orientals regardless of their ability to repay the loans. Nor, it seems to me, does it provide a sufficient justification for granting a preference to a broad class that includes, at one extreme, firms that have no credit

problem [16] and at the other extreme, firms whose unsatisfactory credit rating will prevent them from taking advantage of the statutory preference even though they are otherwise qualified to do the work. At best, the preference for minority business enterprises is a crude and inadequate response to the evils that flow from discriminatory lending practices.

The question whether the history of past discrimination has created barriers that can only be overcome by an unusual measure of this kind is more difficult to evaluate. In analyzing this question, I think it is essential to draw a distinction between obstacles placed in the path of minority business enterprises by others and characteristics of those firms that may impair their ability to compete.

It is unfortunately but unquestionably true that irrational racial prejudice persists today and continues to obstruct minority participation in a variety of economic pursuits, presumably including the construction industry. But there are two reasons why this legislation will not eliminate, or even tend to eliminate, such prejudice. First, prejudice is less likely to be a significant factor in the public sector of the economy than in the private sector because both federal and

---

[16] An example of such a firm was disclosed in the record of a recent case involving a claimed preference for a firm controlled by Indian shareholders:

"Based on the facts that were developed in the District Court, . . . the Indian community in general does not benefit from the [Bureau of Indian Affairs'] interpretation of [the Buy Indian Act].

"The facts that were developed in the District Court show that the beneficiaries of this interpretation were the owners of Indian Nations Construction Company. The president of that company is a one-fourth degree Indian who is an administrative law judge for the Department of Health, Education, and Welfare by occupation. The vice president of that company was a one-quarter blood Choctaw who is a self-employed rancher and who states his net worth at just under a half million dollars. The treasurer and general manager of that corporation is a non-Indian and he states his net worth at $1.3 million." Tr. of Oral Arg. in *Andrus* v. *Glover Construction Co.*, O. T. 1979, No. 79–48, pp. 26–27.

state laws have prohibited discrimination in the award of public contracts for many years. Second, and of greater importance, an absolute preference that is unrelated to a minority firm's ability to perform a contract inevitably will engender resentment on the part of competitors excluded from the market for a purely racial reason and skepticism on the part of customers and suppliers aware of the statutory classification. It thus seems clear to me that this Act cannot be defended as an appropriate method of reducing racial prejudice.

The argument that our history of discrimination has left the entire membership of each of the six racial classes identified in the Act less able to compete in a free market than others is more easily stated than proved. The reduction in prejudice that has occurred during the last generation has accomplished much less than was anticipated; it nevertheless remains true that increased opportunities have produced an ever-increasing number of demonstrations that members of disadvantaged races are entirely capable not merely of competing on an equal basis, but also of excelling in the most demanding professions. But, even though it is not the actual predicate for this legislation, a statute of this kind inevitably is perceived by many as resting on an assumption that those who are granted this special preference are less qualified in some respect that is identified purely by their race.[17] Because that perception—especially when fostered by the Congress of the United States—can only exacerbate rather than reduce racial prejudice, it will delay the time when race will become a truly irrelevant, or at least insignificant, factor. Unless Congress clearly articulates the need and basis for a racial classification, and also tailors the classification to its justification, the Court should not uphold this kind of statute.

---

[17] See *United Jewish Organizations* v. *Carey,* 430 U. S. 144, 173–174 (BRENNAN, J., concurring in part): "[E]ven preferential treatment may act to stigmatize its recipient groups, for although intended to correct systemic or institutional inequities, such a policy may imply to some the recipients' inferiority and especial need for protection."

This Act has a character that is fundamentally different from a carefully drafted remedial measure like the Voting Rights Act of 1965. A consideration of some of the dramatic differences between these two legislative responses to racial injustice reveals not merely a difference in legislative craftsmanship but a difference of constitutional significance. Whereas the enactment of the Voting Rights Act was preceded by exhaustive hearings and debates concerning discriminatory denial of access to the electoral process, and became effective in specific States only after specific findings were made, this statute authorizes an automatic nationwide preference for all members of a diverse racial class regardless of their possible interest in the particular geographic areas where the public contracts are to be performed. Just why a wealthy Negro or Spanish-speaking investor should have a preferred status in bidding on a construction contract in Alaska—or a citizen of Eskimo ancestry should have a preference in Miami or Detroit—is difficult to understand in light of either the asserted remedial character of the set-aside or the more basic purposes of the public works legislation.

The Voting Rights Act addressed the problem of denial of access to the electoral process. By outlawing specific practices, such as poll taxes and special tests, the statute removed old barriers to equal access; by requiring preclearance of changes in voting practices in covered States, it precluded the erection of new barriers. The Act before us today does not outlaw any existing barriers to access to the economic market and does nothing to prevent the erection of new barriers. On the contrary, it adopts the fundamentally different approach of creating a new set of barriers of its own.

A comparable approach in the electoral context would support a rule requiring that at least 10% of the candidates elected to the legislature be members of specified racial minorities. Surely that would be an effective way of ensuring black citizens the representation that has long been their due.

Quite obviously, however, such a measure would merely create the kind of inequality that an impartial sovereign cannot tolerate. Yet that is precisely the kind of "remedy" that this Act authorizes. In both political and economic contexts, we have a legitimate interest in seeing that those who were disadvantaged in the past may succeed in the future. But neither an election nor a market can be equally accessible to all if race provides a basis for placing a special value on votes or dollars.

The ultimate goal must be to eliminate entirely from governmental decisionmaking such irrelevant factors as a human being's race. The removal of barriers to access to political and economic processes serves that goal.[18] But the creation of new barriers can only frustrate true progress. For as MR. JUSTICE POWELL[19] and Mr. Justice Douglas[20] have perceptively observed, such protective barriers reinforce habitual ways of thinking in terms of classes instead of individuals. Preferences based on characteristics acquired at birth foster intolerance and antagonism against the entire membership of the favored classes.[21] For this reason, I am firmly convinced

---

[18] "The Equal Protection Clause commands the elimination of racial barriers, not their creation in order to satisfy our theory as to how society ought to be organized." *DeFunis* v. *Odegaard,* 416 U. S. 312, 342 (Douglas, J., dissenting).

[19] See *University of California Regents* v. *Bakke,* 438 U. S., at 298.

[20] *DeFunis* v. *Odegaard, supra,* at 343 (dissenting opinion).

[21] In his *Bakke* opinion, *supra,* MR. JUSTICE POWELL stated:

"It is far too late to argue that the guarantee of equal protection to *all* persons permits the recognition of special wards entitled to a degree of protection greater than that accorded others." 438 U. S., at 295.

In support of that proposition he quoted Professor Bickel's comment on the self-contradiction of that argument:

" 'The lesson of the great decisions of the Supreme Court and the lesson of contemporary history have been the same for at least a generation: discrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society.' " *Id.,* at 295, n. 35.

that this "temporary measure" will disserve the goal of equal opportunity.

## V

A judge's opinion that a statute reflects a profoundly unwise policy determination is an insufficient reason for concluding that it is unconstitutional. Congress has broad power to spend money to provide for the "general Welfare of the United States," to "regulate Commerce . . . among the several States," to enforce the Civil War Amendments, and to discriminate between aliens and citizens. See *Hampton* v. *Mow Sun Wong*, 426 U. S. 88, 101–102, n. 21.[22] But the exercise of these broad powers is subject to the constraints imposed by the Due Process Clause of the Fifth Amendment. That Clause has both substantive and procedural components; it performs the office of both the Due Process and Equal Protection Clauses of the Fourteenth Amendment in requiring that the federal sovereign act impartially.

Unlike MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST, however, I am not convinced that the Clause contains an absolute prohibition against any statutory classification based on race. I am nonetheless persuaded that it does impose a special obligation to scrutinize any governmental decisionmaking process that draws nationwide distinctions between citizens on the basis of their race and incidentally also discriminates against noncitizens in the preferred racial classes.[23]

---

[22] This preferential set-aside specifically discriminates in favor of citizens of the United States. See *supra*, at 535.

[23] "When the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest." *Hampton* v. *Mow Sun Wong*, 426 U. S. 88, 103.

"It is perfectly clear that neither the Congress nor the President has ever *required* the Civil Service Commission to adopt the citizenship requirement as a condition of eligibility for employment in the federal civil service. On the other hand, in view of the fact that the policy has been in effect since the Commission was created in 1883, it is fair to infer that

For just as procedural safeguards are necessary to guarantee impartial decisionmaking in the judicial process, so can they play a vital part in preserving the impartial character of the legislative process.[24]

In both its substantive and procedural aspects this Act is markedly different from the normal product of the legislative decisionmaking process. The very fact that Congress for the first time in the Nation's history has created a broad legislative classification for entitlement to benefits based solely on racial characteristics identifies a dramatic difference between this Act and the thousands of statutes that preceded it. This dramatic point of departure is not even mentioned in the statement of purpose of the Act or in the Reports of either the House or the Senate Committee that processed the legislation,[25] and was not the subject of any testimony or inquiry

---

both the Legislature and the Executive have been aware of the policy and have acquiesced in it. In order to decide whether such acquiescence should give the Commission rule the same support as an express statutory or Presidential command, it is appropriate to review the extent to which the policy has been given consideration by Congress or the President, and the nature of the authority specifically delegated to the Commission." *Id.*, at 105.

[24] See Linde, Due Process of Lawmaking, 55 Neb. L. Rev. 197, 255 (1976):

"For the last few years have reawakened our appreciation of the primacy of process over product in a free society, the knowledge that no ends can be better than the means of their achievement. 'The highest morality is almost always the morality of process,' Professor Bickel wrote about Watergate a few months before his untimely death. If this republic is remembered in the distant history of law, it is likely to be for its enduring adherence to legitimate institutions and processes, not for its perfection of unique principles of justice and certainly not for the rationality of its laws. This recognition now may well take our attention beyond the processes of adjudication and of executive government to a new concern with the due process of lawmaking." (Footnote omitted.)

[25] The only reference to any minority business enterprises in the Senate Report was a suggestion that Indians had been receiving *too great a share* of the public contracts. The Report stated:

"Some concern was expressed that Indians—with exceptionally high struc-

in any legislative hearing on the bill that was enacted. It is true that there was a brief discussion on the floor of the House as well as in the Senate on two different days, but only a handful of legislators spoke and there was virtually no debate. This kind of perfunctory consideration of an unprecedented policy decision of profound constitutional importance to the Nation is comparable to the accidental malfunction of the legislative process that led to what I regarded as a totally unjustified discrimination in *Delaware Tribal Business Committee* v. *Weeks,* 430 U. S., at 97.

Although it is traditional for judges to accord the same presumption of regularity to the legislative process no matter how obvious it may be that a busy Congress has acted precipitately, I see no reason why the character of their procedures may not be considered relevant to the decision whether the legislative product has caused a deprivation of liberty or property without due process of law.[26] Whenever

---

tural unemployment levels—were awarded projects at a per capita value far in excess of non-Indian communities." S. Rep. No. 95–38, p. 3 (1977).

The Court quotes three paragraphs from a lengthy Report issued by the House Committee on Small Business in 1977, *ante,* at 465–466, implying that the contents of that Report were considered by Congress when it enacted the 10% minority set-aside. But that Report was not mentioned by anyone during the very brief discussion of the set-aside amendment. When one considers the vast quantity of written material turned out by the dozens of congressional committees and subcommittees these days, it is unrealistic to assume that a significant number of legislators read, or even were aware of, that Report. Even if they did, the Report does not contain an explanation of this 10% set-aside for six racial subclasses.

Indeed, the broad racial classification in this Act is totally unexplained. Although the legislative history discussed by THE CHIEF JUSTICE and by MR. JUSTICE POWELL explains why Negro citizens are included within the preferred class, there is absolutely no discussion of why Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts were also included. See n. 6, *supra.*

[26] "It is not a new thought that 'to guarantee the democratic legitimacy of political decisions by establishing essential rules for the political process' is the central function of judicial review, as Dean Rostow and Profes-

Congress creates a classification that would be subject to strict scrutiny under the Equal Protection Clause of the Fourteenth Amendment if it had been fashioned by a state legislature, it seems to me that judicial review should include a consideration of the procedural character of the decision-making process.[27] A holding that the classification was not adequately preceded by a consideration of less drastic alternatives or adequately explained by a statement of legislative purpose would be far less intrusive than a final determination that the substance of the decision is not "narrowly tailored to the achievement of that goal."[28] Cf. THE CHIEF JUSTICE's opinion, *ante,* at 480; MR. JUSTICE MARSHALL's opinion concurring in the judgment, *ante,* at 521. If the general language of the Due Process Clause of the Fifth Amendment

sor Strong, among others, have argued." Linde, *supra,* 55 Neb. L. Rev., at 251.

[27] See Sandalow, Judicial Protection of Minorities, 75 Mich. L. Rev. 1162, 1188 (1977):

"[I]f governmental action trenches upon values that may reasonably be regarded as fundamental, that action should be the product of a deliberate and broadly based political judgment. The stronger the argument that governmental action does encroach upon such values, the greater the need to assure that it is the product of a process that is entitled to speak for the society. Legislation that has failed to engage the attention of Congress, like the decisions of subordinate governmental institutions, does not meet that test, for it is likely to be the product of partial political pressures that are not broadly reflective of the society as a whole."

[28] "Fear of legislative resentment at judicial interference is not borne out by experience where procedural review exists, any more than it was after the Supreme Court told Congress that it had used faulty procedure in unseating Representative Adam Clayton Powell. It is far more cause for resentment to invalidate the substance of a policy that the politically accountable branches and their constitutents support than to invalidate a lawmaking procedure that can be repeated correctly, yet we take substantive judicial review for granted. Strikingly, the reverse view of propriety prevails in a number of nations where courts have never been empowered to set aside policies legitimately enacted into law but do have power to test the process of legitimate enactment." Linde, *supra,* 55 Neb. L. Rev., at 243 (footnotes omitted).

authorizes this Court to review Acts of Congress under the standards of the Equal Protection Clause of the Fourteenth Amendment—a clause that cannot be found in the Fifth Amendment—there can be no separation-of-powers objection to a more tentative holding of unconstitutionality based on a failure to follow procedures that guarantee the kind of deliberation that a fundamental constitutional issue of this kind obviously merits.[29]

In all events, rather than take the substantive position expressed in MR. JUSTICE STEWART's dissenting opinion, I would hold this statute unconstitutional on a narrower ground. It cannot fairly be characterized as a "narrowly tailored" racial classification because it simply raises too many serious questions that Congress failed to answer or even to address in a responsible way.[30] The risk that habitual attitudes toward

---

[29] The conclusion to THE CHIEF JUSTICE's opinion states:

"Any preference based on racial or ethnic criteria must necessarily receive a *most searching examination* to make sure that it does not conflict with constitutional guarantees." *Ante,* at 491 (emphasis added).

I agree with this statement but it seems to me that due process requires that the "most searching examination" be conducted in the first instance by Congress rather than by a federal court.

[30] For example, why were these six racial classifications, and no others, included in the preferred class? Why are aliens excluded from the preference although they are not otherwise ineligible for public contracts? What percentage of Oriental blood or what degree of Spanish-speaking skill is required for membership in the preferred class? How does the legacy of slavery and the history of discrimination against the descendants of its victims support a preference for Spanish-speaking citizens who may be directly competing with black citizens in some overpopulated communities? Why is a preference given only to owners of business enterprises and why is that preference unaccompanied by any requirement concerning the employment of disadvantaged persons? Is the preference limited to a subclass of persons who can prove that they are subject to a special disability caused by past discrimination, as the Court's opinion indicates? Or is every member of the racial class entitled to a preference as the statutory language seems plainly to indicate? Are businesses formed just to take advantage of the preference eligible?

classes of persons, rather than analysis of the relevant characteristics of the class, will serve as a basis for a legislative classification is present when benefits are distributed as well as when burdens are imposed. In the past, traditional attitudes too often provided the only explanation for discrimination against women, aliens, illegitimates, and black citizens. Today there is a danger that awareness of past injustice will lead to automatic acceptance of new classifications that are not in fact justified by attributes characteristic of the class as a whole.

When Congress creates a special preference, or a special disability, for a class of persons, it should identify the characteristic that justifies the special treatment.[31] When the classification is defined in racial terms, I believe that such particular identification is imperative.

In this case, only two conceivable bases for differentiating the preferred classes from society as a whole have occurred to me: (1) that they were the victims of unfair treatment in the past and (2) that they are less able to compete in the future. Although the first of these factors would justify an appropriate remedy for past wrongs, for reasons that I have already stated, this statute is not such a remedial measure. The second factor is simply not true. Nothing in the record of this case, the legislative history of the Act, or experience that we

---

[31] "Of course, a general rule may not define the benefited class by reference to a distinction which irrationally differentiates between identically situated persons. Differences in race, religion, or political affiliation could not rationally justify a difference in eligibility for social security benefits, for such differences are totally irrelevant to the question whether one person is economically dependent on another. But a distinction between married persons and unmarried persons is of a different character." *Califano* v. *Jobst*, 434 U. S. 47, 53.

"If there is no group characteristic that explains the discrimination, one can only conclude that it is without any justification that has not already been rejected by the Court." *Foley* v. *Connelie*, 435 U. S. 291, 312 (STEVENS, J., dissenting).

may notice judicially provides any support for such a proposition. It is up to Congress to demonstrate that its unique statutory preference is justified by a relevant characteristic that is shared by the members of the preferred class. In my opinion, because it has failed to make that demonstration, it has also failed to discharge its duty to govern impartially embodied in the Fifth Amendment to the United States Constitution.

I respectfully dissent.